Ralph W. KEITH, et al., Plaintiffs,

v.

John A. VOLPE, as Secretary of Transportation, et al., Defendants.

No. Civil 72–355–HP.

United States District Court, C.D. California.

Oct. 2, 1996.

Carlyle W. Hall, Jr., Hall & Associates, Los Angeles, CA, for Plaintiffs.

Robert L. McWhirk, Culver City, CA, for Century Housing Corp.

O.J. Solander, Sacramento, CA, for State of Cal. Dept. of Transp.

Charles F. Kester, Gibson, Dunn & Crutcher, L.L.P., Los Angeles, CA, for Robert L. Kudler.

## ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

PREGERSON, Circuit Judge, sitting by designation.

This matter comes before the court on plaintiffs' request for a preliminary injunction prohibiting the State of California Department of Transportation ("Caltrans"), Gary W. Bush, James W. Van Loben Sels, and their agents from issuing any permit to non-party Robert L. Kudler that would allow him to place any billboard or other outdoor advertising displays along the Interstate 105 freeway ("I–105") in Los Angeles County.

The court has considered the documents filed in this matter, including the briefs of the parties and non-party Kudler. In addition, the court has heard argument and considered the affidavits and declarations submitted by the parties and non-party Kudler. The court has also reviewed the record of this litigation, including: this court's 1972 injunction, *Keith v. Volpe,* 352 F.Supp. 1324 (C.D.Cal.1972), *aff'd sub nom Keith v. California Highway Comm'n,* 506 F.2d 696 (9th Cir.1974) (en banc), *cert. denied,* 420 U.S. 908, 95 S.Ct. 826, 42 L.Ed.2d 837 (1975); the Final Environmental Impact Statement for the Proposed Routes 1 & I–105 (El Segundo–Norwalk) Freeway–Transitway, vols. 1–2 ("the Final EIS") filed on July 21, 1977; and this court's Final Amended Consent Decree ("the Amended Decree") filed on September 22, 1981 and attached here as appendix A. Being fully advised, the court finds and rules as follows:

## I. BACKGROUND AND PRIOR PROCEEDINGS

The matter before this court requires an interpretation of the Amended Decree and the proceedings leading up to it. The Amended Decree settled nearly a decade of litigation concerning the construction of I–105, a federally funded highway that is now part of the interstate highway system.

### A. The 1972 Injunction

This environmental protection and civil rights suit was filed in February 1972 by persons living in the path of the I–105 freeway, and by the NAACP, the Sierra Club, Environmental Defense Fund, City of Hawthorne, and others.

Plaintiffs brought suit under the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. §§ 4321–4347, the California Environmental Quality Act of 1970, Calif. Pub. Res.Code §§ 21000–21151, the Federal–Aid Highway Act of 1968, 23 U.S.C. §§ 128(a), 501–511, and the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U.S.C. §§ 4601–4655. Plaintiffs asked the court to halt work on the I–105 project, which would displace 21,000 persons, until government officials complied with the above mentioned statutes, which were enacted to protect the human environment, to protect homeowners, tenants, and businesses forced to relocate, and to secure public participation in the highway decision-making process through public hearings.

After conducting hearings on plaintiffs' 1972 motion for a preliminary injunction, the court determined that plaintiffs' claims were well-founded. The evidence presented to the court disclosed a number of deficiencies in the relocation studies on the availability of "decent, safe, and sanitary housing" required by 42 U.S.C. § 4623(a)(1)(A). The severest housing shortage was in the Watts–Willowbrook area.

Evidence presented to the court during the 1972 hearings also revealed that the federal and state defendants [1] had given little consideration to the freeway's environmental effects. On the evidence before it, the court found that as of 1972 the defendants had failed to comply with NEPA because they refused to prepare an EIS for the I–105 project. 352 F.Supp. at 1332. NEPA requires that an EIS be prepared for any major action significantly affecting the human environment. 42 U.S.C. § 4332(2)(C). In this case, the defendants agreed that I–

---

1. The principal defendants were the U.S. Department of Transportation, the Federal Highway Administration, and Caltrans.

105 was a major federal action significantly affecting the human environment, but argued that an EIS was not required for the I-105 project because the freeway had been planned and initiated before NEPA was enacted. 352 F.Supp. at 1330.

The court rejected that position, finding that the federal and state governments had "failed to satisfy NEPA's commandments." 352 F.Supp. at 1330. The court explained that an EIS, given the early stage of the I-105 project, was not optional under NEPA:

> The message of NEPA is loud and clear. Section 101(a) declares that
>
>> it is the continuing policy of the Federal Government ... to use all practicable means and measures ... to create and maintain conditions under which man and nature can exist in productive harmony....
>
> Section 101(b) provides that in order to carry out this policy,
>
>> it is the continuing policy of the Federal Government to use all practical means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may ... assure for all Americans safe, healthful, productive, and *esthetically and culturally pleasing surroundings.*

352 F.Supp. at 1332 (quoting 42 U.S.C. § 4331(b)) (emphasis added).

Noting Congress's directive that NEPA be complied with "to the fullest extent possible," 42 U.S.C. § 4332, this court concluded that "the application of NEPA to [I-105] should not be considered impracticable" because "five of the freeway's eight segments were still in their planning stage." 352 F.Supp. at 1333. Because no final plan for I-105 had yet been approved, "the general judicial policy against the retroactive application of statutes ... was inapplicable." *Id.* (citations omitted).

On July 7, 1972, the court issued a preliminary injunction halting further work on I-105 until government officials prepared an EIS as required by NEPA. 352 F.Supp. at 1324. In addition, the court's order required that governmental officials hold additional public hearings, conduct further housing availability studies, and give satisfactory assurances that adequate replacement housing would be available as required by the Federal-Aid Highway Act and the Uniform Relocation Assistance and Real Property Acquisition Policies Act.

## B. The Final EIS

The Final EIS was completed in July of 1977. During 1969 and 1970 (before the court's 1972 injunction), the Division of Highways (Caltrans's predecessor agency) studied the "environmental, physical, social and economic impacts" of the path of the proposed I-105. Final EIS at 2-13. The Division of Highway's original project design was developed by a "Design Concept Team," which was a group comprised of "environmental and urban planners, architects, economists, sociologists and others familiar with urban problems and impacts, as well as highway engineers." Final EIS at 3-4. The Design Concept Team conducted studies that were "aimed at *seeking ways to blend the Project into its urban setting* by pointing out ways of maximizing opportunities for enhancing the neighborhood-freeway relationship and *minimizing potential disruptive effects* of the facility." Final EIS at 2-13 (emphasis added). The design studies included consideration of a plethora of factors, including neighborhood environmental values, as well as design implications. *Id.* The I-105 design was a matter of great concern for the communities affected by the project and the Division of Highways held seven public hearings about the freeway's design. Over 5,600 people attended these meetings. *Id.*

The 1972 injunction, however, required the federal and state governments to conduct a more substantial review of the I-105 project. Accordingly, between 1972 and 1974, Caltrans and the Federal Highway Administration ("FHWA") undertook a formal environmental study, leading to preparation of an EIS. Upon order of the court, this study analyzed the I-105 project in light of NEPA's environmental policy mandates and federal housing availability requirements. A Draft EIS, containing summaries of the find-

ings, was made available for public comment on December 19, 1974.

There is no doubt that review of the Draft EIS was extensive. It included over 150 open meetings with public officials and the review of hundreds of letters, some expressing concerns and others supporting the project. During the spring of 1975, numerous public hearings were held to provide the Draft EIS project with more information and to afford the public an opportunity to discuss the Draft EIS. These public comment hearings were held in the various communities that abut the I-105. Total attendance at these meetings was 1,230 people. Final EIS at 2-12. Two additional hearings were held after two modifications to the project were suggested by the California Highway Commission (Caltrans) and the City of Hawthorne. Total attendance at these two meetings was 1,150. *Id.*

Freeway development requires extensive negotiations between federal, state, county, and local governments. The I-105 project was no exception. In these negotiations, determination of the vertical alignment of the freeway (i.e., at-grade, depressed, or elevated), the landscaping concept and features, and the placement of noise-attenuation and retaining walls, all became part of the federal and state government's negotiations with city and county officials. Final EIS at 2-12 to 2-13. As the Final EIS assures:

The Division of Highways (Caltrans), has always maintained close working relationships with local city staffs. Planning and design coordination efforts continued after execution of freeway agreements to insure that mutually agreeable and desirable design feature changes are made when conditions warrant. The currently proposed design ... has been reviewed favorably by all jurisdictions involved.

Final EIS at 2-14.

The Final EIS did not skirt discussion of the freeway's aesthetic impact on the communities involved. In a significant section, entitled "AESTHETICS AND AMENITIES," the Final EIS set forth a plan for aesthetics mitigation. Final EIS at 5-33 to 5-35. The Aesthetics and Amenities section assured that the freeway's potential adverse aesthetic impacts would be minimized through architectural design measures. This section sketched a modern freeway that would not only "provide safety and service" but would also "bring the Project's visual elements into harmony with the surroundings." Final EIS at 5-33.

Sections of I-105 that had to be elevated on embankments or bridge structures presented a major challenge for plans to minimize the freeway's aesthetic impact. Yet even at these elevated sections, the Final EIS promised to attenuate negative visual impacts:

The portions of the highway elevated on embankment, especially through residential areas, will probably be screened with sound attenuation walls, a dense screen of shrubs, or a combination of both to shield the roadway and traffic from view. The side slopes will then be planted with evergreen and flowering plant material, aimed at providing a pleasant visual experience for the community. Plant material and design styles will be chosen that best blend into the community and, where possible, improve it. Through commercial and industrial areas, screen planting is ordinarily not used, and slopes are planted to conform with the landscape of the adjacent properties. This will provide a strong continuity in form and texture.

Bridge structures across arterial streets are being designed with careful consideration given to the architectural character created.

Freeway-to-freeway interchanges are frequently visible from a great distance and affect a large area. As in the case of bridge structures, emphasis will be placed on the aesthetics of the structural design. Outward-facing slopes will be screened where appropriate, and all planting areas will be landscaped to establish a visually oriented park-like atmosphere ...

Architectural treatment of viaduct structures will differ in impact, depending on the development of areas beneath and immediately adjacent to them. Local policy and design requirements will undoubtedly have a considerable effect on what kind of

visual experience results from viaduct structures in the communities along the right-of-way.

Final EIS at 5–34.

The aesthetic plan for I–105 was not limited to how the freeway would look from the perspective of the surrounding communities. The Aesthetics and Amenities section also included a subsection, entitled *"Views from the Facility."* This subsection addressed the perspective from the freeway itself:

> While views from the facility will occur at a larger scale than most views of it, the design principles to be utilized remain the same. Essentially, discordant elements must be brought into visual harmony.

Final EIS at 5–34. In discussing the view from the I–105, this subsection of the Final EIS promised to make the I–105 blend into the landscape around it. "Visual harmony" was to be presented to the passing motorist as well as to the surrounding communities. *Id.*

The I–105 architects' decision to interrupt landscaping at elevated portions of the freeway was deliberate, made for both safety and aesthetic purposes. As the Final EIS explains:

> Along elevated portions of the Project, particularly through residential areas, the continuous screen planting will tend to produce some monotony, especially for the passengers. *The continuous screen will be broken through commercial and industrial areas, providing variation and an overview of the urban landscape.*

Final EIS at 5–34 (emphasis added). Thus, to counter the danger of visual monotony, the Final EIS defined "landscape" broadly, allowing for breaks in vegetative plantings to present motorists with overviews of the "urban landscape." *Id.*

Providing drivers and passengers with an opportunity to enjoy clean vistas of the surrounding communities was a primary concern for the drafters of the Final EIS. The Final EIS promised to give motorists a good first impression of a community as they entered from the freeway:

> Particular design and landscaping consideration will be given to off-ramp areas

where a visitor's first impressions of a community will be formed. The Project's design and landscaping will be directed toward a smooth transition from the large scale to the more intimate scale of the community.

Final EIS at 5–35.

To be sure, the Final EIS did not promise surrounding communities and motorists an architectural wonder. The Final EIS's aesthetic goal was quite honest and even modest:

> Clearly, a Project of this magnitude will have visual impact to the extent that it will change existing vistas and create new visual impressions ranging from subtle to bold. Subtle changes would be anticipated, for example, in the case of a depressed roadway through a residential community [ . . . ]

Final EIS at 5–35. But even in the elevated sections of I–105, the Final EIS anticipated that these elevated sections would "probably create expansive and perhaps occasional dramatic views for motorists." *Id.*

### C. The Amended Decree

On September 22, 1981, the court filed the Amended Decree, which dissolved the court's 1972 injunction and allowed construction of I–105 to proceed. The Amended Decree ordered the following:

> In view of the EIS and the terms contained in this Decree, the parties agree that the injunction heretofore entered by this court on July 7, 1972 shall forthwith be dissolved . . .

Amended Decree at 5. The Amended Decree further ordered:

> The I–105 Freeway shall be constructed as proposed in the Final Environmental Impact Statement on file with the above-entitled court, except as modified by the specific provisions of this decree.

*Id.* This language in the Amended Decree clearly requires that the decree is to be read along with the extensive proposals contained in the Final EIS. This makes sense—after all, one of the purposes of the Amended Decree was to bring the I–105 project in compliance with NEPA.

Section VII of the Amended Decree, entitled "Nonseverability of Decree's Provisions," stipulates that the material portions of the decree are not severable, and invalidation of one provision allows the parties to seek dissolution of the Amended Decree and pursue available legal remedies. Amended Decree at 16. This stipulation necessarily applies to the Final EIS because it was explicitly incorporated by reference in the Amended Decree. See Amended Decree at 5 (quoted above). The Final EIS supplements the Amended Decree with in-depth discussions of the details of the mitigation measures that federal and state defendants agreed to perform in exchange for the dissolution of the 1972 preliminary injunction.

Thus, the Amended Decree and Final EIS *together* form the settlement agreement that benefited all parties. The federal and state defendants were permitted to proceed with the construction of I–105, and plaintiffs were assured that the freeway would be built in conformity with the Amended Decree and Final EIS, which promised to mitigate negative aesthetic effects on motorists and surrounding communities.

To date, the settlement of this litigation in 1981 has achieved important public goals, the most obvious achievement being the opening of a fast way to get across Los Angeles County. But the I–105 freeway was also built with an eye to future transportation needs. As constructed, the I–105 incorporates a fixed-rail public transit system in lieu of a previously contemplated busway.[2] This fixed-rail line is now part of the Los Angeles Metro system. In addition, the Amended Decree and Final EIS, read together, put into effect NEPA's policy that a major federal project assure "safe, healthful, productive, and esthetically and culturally pleasing sur-

roundings." 42 U.S.C. § 4331(b); *see also* Final EIS at 5–33 to 5–35 ("AESTHETICS AND AMENITIES").[3]

In 1993, I–105 was completed and opened to motor traffic. According to Caltrans' Senior Landscape Architect, Dale Williams, Caltrans has taken aesthetic mitigation measures at elevated sections of the freeway. *See* Request for Judicial Notice, filed Aug. 12, 1995 (C.D.Cal.) (Declaration of Dale Williams in Support of Return to Petition For Writ of Mandate, Los Angeles County Sup.Ct., filed May 7, 1996) ("Dale Declaration"). In particular, "aesthetic treatment of 2–tone tan color split face block" has been used as well as "texture treatment" which has helped to soften the freeway's negative aesthetic impact. Dale Declaration at 2. As the photographs submitted in support of Dale Williams's declaration show, these elevated sections of the freeway do appear to be "landscaped." Dale Declaration, Exhibits 4–10 (photographs).

To date, plaintiffs have not brought before the court any claims that defendants have violated the terms of the Amended Decree. The freeway, as it stands today, has apparently fulfilled the aesthetic expectations of the parties.[4]

### D. Non-party Kudler's State Court Action

Plaintiffs' action to enjoin Caltrans from issuing permits was precipitated by a state court suit brought against Caltrans by non-party Kudler. Kudler, an advertising billboard developer, filed applications with Caltrans for permits that would allow him to construct billboards on ten sites along I–105. Caltrans refused to issue those permits to

---

**2.** During 1973 and 1974, changes in the Federal Aid Highway Act made federal monies available for mass transit projects. Accordingly, the I–105 plan was altered to recommend that a "busway" be built in the freeway median. In July 1974, the busway plan was approved.

**3.** The Amended Decree also provided for various mitigating measures to redress the economic and social impacts of the freeway. Mitigation measures included a massive low-income affordable housing program and job-training programs for affected persons. The Amended Decree also re-

served to this court the power to modify the decree's terms on motion of any party. *Keith v. Volpe*, 784 F.2d 1457 (9th Cir.1986).

**4.** It is important to note that at oral argument, the court asked the parties if there were any billboards along the I–105 right-of-way. Although non-party Kudler submitted that there may be illegally constructed billboards on private property near the freeway, Caltrans has assured the court that it has not permitted the placement of any billboards along I–105.

him based on its understanding of its obligations under the Amended Decree.

Caltrans believes that the Amended Decree disallows billboards along I–105 because the decree requires that the entire freeway be constructed as a "landscaped freeway." Caltrans also believes that it has met the court's requirement to construct a landscaped freeway because the landscaping of I–105 encompasses both plantings and architectural design features that fulfill the Final EIS's aesthetic promises. *See* Dale Declaration at 2. Accordingly, Caltrans believes that the Amended Decree's mandate that I–105 be built as a "landscaped freeway" requires it to deny all requests for billboard permits along I–105. To that end, Caltrans has consistently denied permit applications to all advertising developers seeking to place billboards along I–105. In fact, Caltrans's belief is so strong that, since the state court ruled on this issue, Caltrans has issued an emergency regulation that exempts I–105 from COAA "landscaped freeway" requirements. Thus, applicants for permits to place billboards along I–105 can no longer rely on COAA's regulations.

Non-party Kudler disputes Caltrans's understanding of the term "landscaped freeway" found in the Amended Decree. Kudler argued in state court that the meaning of the term "landscaped freeway" in the Amended Decree is determined by regulations promulgated under the California Outdoor Advertising Act ("COAA"), Cal. Prof. & Bus.Code § 5271. These regulations define "landscaped freeway" as a section of freeway which is continuously planted for 1000 feet or more. COAA regs. §§ 2502(f) & 2511.[5] The COAA regulations also limit Caltrans's discretion to *declassify* a landscaped freeway. The regulations provide that a section of landscaped freeway cannot lose its "landscaped" status if that section has gaps in plantings of 200 feet or less. *Id.* At a few elevated sections of I–105, there are gaps in the vegetative plantings that are longer than 200 feet. Kudler contends that the COAA regulations should be read as limiting Caltrans's discretion to *classify* those elevated sections as "landscaped." It is at these elevated sections that Kudler wants to erect his ten billboards.

The state court agreed with Kudler's view and determined that the elevated sections of I–105 were not, and never could be, designated as "landscaped" under COAA regulations §§ 2502(f) & 2511. The state court concluded that Caltrans had improperly denied permits to Kudler. Accordingly, that court granted a writ of mandate that ordered Caltrans to issue billboard permits to Kudler.

In granting the writ, the state court interpreted the Amended Decree as not contemplating billboards; its writ, the state court reasoned, would therefore not conflict with this court's Amended Decree. In deciding that the Amended Decree did not address the issue of billboards along the I–105, the state court overlooked the history of this litigation; the intentions of the parties; the important federal policies vindicated by the Amended Decree; and the aesthetic provisions of the Final EIS which are an integral part of the Amended Decree. These oversights explain why the state court incorrectly

---

**5.** COAA regulation § 2502(f) states:

"Continuous planting" means state right-of-way contiguous to the traveled way which is planted with ornamental vegetation in accordance with standard landscaping practices. Physical breaks in the planting of less than 200 feet for such items as highway overcrossings or undercrossings, streams, canals, stairways, culverts, and water systems, shall not end a continuous planting.

COAA regulation § 2511 states:

To be classified as a landscaped freeway, a continuous planting segment measured parallel from the freeway centerline shall be at least 1,000 feet in length. For the purposes of these regulations, the 1,000–foot length shall be calculated by either of the following:

(a) 1,000 linear feet of continuous planting on one side of the freeway, or
(b) 1,000 linear feet of landscaped area which is the combination of continuous plantings on both sides of the freeway. These plantings can either overlap or have a common point of beginning and ending, as measured along the freeway centerline.
If a continuous planting segment as described above is followed by a gap of 200 feet or less and adjoins continuous planting which is at least 500 feet in length, the designation "landscaped freeway" will apply to the total length of the continuous planting segment, the "gap" and the continuous planting.

read the COAA regulations as obligating Caltrans to issue billboard permits to Kudler for sites along the elevated sections of the freeway where gaps in vegetative planting exceeded 200 feet in length. *See Kudler v. California Dept. of Transportation*, No. BC 138916, Statement of Decision at 5 (Cal.Sup. Ct.1996) (interpreting COAA regulation §§ 2502(f) & 2511).

### E. The Temporary Restraining Order

In July 1996, plaintiffs sought injunctive relief in this court to prevent Caltrans from issuing a permit to non-party Kudler to place billboards or other outdoor advertising displays along the now completed I-105.

Plaintiffs argue that the state court incorrectly read the Amended Decree. Plaintiffs state that the state court's writ contradicts the terms of the Amended Decree because the decree requires that I-105 be "constructed as a landscaped freeway." According to the plaintiffs, this means that Caltrans cannot permit the placement of billboards alongside the freeway without violating the instructions of the Amended Decree. Caltrans agrees with plaintiffs' understanding of the Amended Decree and does not oppose plaintiffs' motion that Caltrans be enjoined from issuing the ten permits to Kudler.

Plaintiffs submit that even if the Amended Decree is arguably ambiguous as to the freeway's overall design, it was their intention that the decree require that the entire length of I-105 would be designed as a billboard-free "landscaped freeway," irrespective of the vagaries of the state regulatory framework. Plaintiffs claim that by agreeing to the consent decree, they accepted an aesthetic plan for the freeway (set forth in the Final EIS) that would be incompatible with the placement of billboards along the elevated sections of I-105. Caltrans shares plaintiffs' understanding that the parties intended that the decree preclude the issuance of permits for the placement of billboards along I-105.

On July 25, 1996, this court issued an Order to Show Cause and Temporary Restraining Order. The TRO ordered the following:

> PENDING determination on the above Order to Show Cause, the California Department of Transportation, Gary W. Bush, James W. Van Loben Sels, their officers, agents, servants, employees and attorneys and all those in active concert or participation with each of them ARE HEREBY RESTRAINED AND ENJOINED from issuing any permits to Robert L. Kudler that would allow him to place any billboard or other outdoor advertising displays along the freeway, including permits allowing him to erect his Proposed Displays 2, 3, 6, 7, 8, 9, 10, 11, 12, and 13, as ordered by the Judgment for Petitioner and Plaintiff Robert L. Kudler, filed July 12, 1996 and attached hereto.

Order to Show Cause Why Injunction to Enforce Consent Decree Should Not Issue and Temporary Restraining Order, No. 72-355-HP, at 2 (C.D. Cal., filed July 25, 1996). Since this court issued the TRO, no permits have issued.

The court held a hearing on the order to show cause on Tuesday, August 13, 1996. The plaintiffs now seek a preliminary injunction to prevent the issuance of permits.

## II. JURISDICTION

As a threshold matter, this court considers whether there is federal jurisdiction over this matter and relatedly, whether abstention may be appropriate.

### A. Original Jurisdiction

■ When this court exercised jurisdiction in 1972, its jurisdiction rested on the federal statutory and constitutional claims brought by plaintiffs. *See Keith*, 352 F.Supp. at 1328–29. In particular, this court ordered compliance with NEPA, the Federal Aid Highway Act, and the Uniform Relocation Assistance and Real Property Acquisition Policies Act. *See* Section I, A, *supra.* Federal question jurisdiction thus existed under 28 U.S.C. § 1331.[6]

---

**6.** The California state claim based on the California Environmental Quality Act, was premised on the "same nucleus of operative fact" as the federal claims, *United Mine Workers v. Gibbs*, 383 U.S. 715, 728, 86 S.Ct. 1130, 1140, 16 L.Ed.2d 218 (1966), and this court exercised its discretion to

■ The matter now before the court, however, is not premised directly on a federal statute or constitutional claim. Rather, this matter is an enforcement action brought by plaintiffs against Caltrans to enforce the terms of the Amended Decree. Federal courts retain power to assert ancillary jurisdiction to enforce a consent decree when that decree has explicitly reserved continuing federal court jurisdiction or when the district court has incorporated the terms of the settlement agreement into its decree. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 378–82, 114 S.Ct. 1673, 1676–77, 128 L.Ed.2d 391 (1994). In *Kokkonen*, the Court explained that when

> the parties' obligation to comply with the terms of the settlement agreement [has] been made part of the order of dismissal— either by separate provision (such as a provision "retaining jurisdiction" over the settlement agreement) or by incorporating the terms of the settlement agreement in the order[,] . . . a breach of the agreement would be a violation of the order, and ancillary jurisdiction to enforce the agreement would therefore exist.

511 U.S. at 381, 114 S.Ct. at 1677. *See also O'Connor v. Colvin,* 70 F.3d 530, 532 (9th Cir.1995) (applying standard); *Hagestad v. Tragesser,* 49 F.3d 1430, 1433 (9th Cir.1995) (same). Such is the case here, where the Amended Decree meets both exceptions provided for in *Kokkonen.*

First, the court reserved continuing jurisdiction to assure compliance with and proper functioning of the decree. The Amended Decree's section, "VI. AMENDMENT TO AND ENFORCEMENT OF FINAL CONSENT DECREE," states:

assert supplemental jurisdiction over that state claim. *See* 28 U.S.C. § 1367(a).

7. Plaintiffs' current motion presents the facts necessary to meet the Amended Decree's standard for the issuance of a preliminary injunction. First, as the parties seeking to enforce the decree are the original plaintiffs, they have standing to request an injunction to enforce the decree. Second, this is a last resort effort on the part of plaintiffs to prevent Caltrans from issuing billboard permits to Kudler. Indeed, plaintiffs awaited the resolution of Kudler's state court action, in which the state court issued a writ of

Upon noticed motion and opportunity to any party to object, this Amended Decree may be modified or amended if plaintiffs' counsel and State and Federal defendants to this litigation agree in writing with the approval of this court. As part of its inherent power, *the court may modify this Amended Decree upon motion by either plaintiffs or Federal defendants or State defendants.*

*If the terms of this Amended Decree are not complied with by any party, then any Party may apply to this Court for appropriate relief.*

This court shall issue an injunction to enforce any terms of this Amended Decree only as a last resort remedy and only when no other remedy would reasonably assure compliance with a significant term. When selecting a remedy for non-compliance, if any, with the terms of this Amended Decree, to the extent that effective enforcement of a significant term of the Amended Decree permits, a primary consideration shall be to avoid delay of the construction, completion, and ultimate opening and operation of the freeway or implementation of the housing program.[7]

Amended Decree at 15–16 (emphasis added). *See also Keith,* 784 F.2d at 1460–61 (recognizing this court's power to interpret and modify the Amended Decree).

Second, it should be noted that the court incorporated the terms of the settlement agreement into the Amended Decree. As discussed above, the Amended Decree mandated that the freeway be constructed as a "landscaped freeway" and that it "be constructed as proposed in the Final Environmental Impact Statement." Amended Decree at 5. Violations of those provisions of the

mandate, before coming to federal court for injunctive relief. Third, if this court adopts the parties' interpretation of the Amended Decree, no remedy other than an injunction to enjoin Caltrans from issuing the permits would assure compliance with the decree. Finally, the terms at issue here constitute "significant terms" in the consent decree because "landscaped freeway" as well as the section of the Final EIS, entitled "AESTHETICS AND AMENITIES" were key assurances of compliance with NEPA's aesthetic concerns. The facts here meet the stipulated requirements for injunctive relief.

Amended Decree constitute a violation of this court's decree, and this court has jurisdiction to enforce those provisions. *Kokkonen,* 511 U.S. at 380–82, 114 S.Ct. at 1677. Nor is this a revolutionary notion, for federal courts have long held a recognized power to enforce their judgments. See *e.g. Blackburn Truck Lines, Inc. v. Francis,* 723 F.2d 730, 732 (9th Cir.1984), *Hamilton v. Nakai,* 453 F.2d 152, 157 (9th Cir.1971) (citing *Root v. Woolworth,* 150 U.S. 401, 14 S.Ct. 136, 37 L.Ed. 1123 (1893)).

■ Despite this court's clear authority to enforce the consent decree, Kudler argues that the matter before the court involves a non-party and that jurisdiction should therefore not extend to his case. Kudler's state claims notwithstanding, the question presented to this court is whether Caltrans would breach its contractual duties under the Amended Decree, and thus defy this court's 1981 order, if it were to issue billboard permits to Kudler. This is not a case where a non-party is bringing an enforcement action under the decree; rather, it is an enforcement action brought by one party against the other to enforce the stipulations of a court's decree.

■ Kudler argues that even if this court were to hold that the Amended Decree prohibits Caltrans from issuing permits for billboards along I–105, the decree should not be applied to him. He argues that a voluntary consent decree cannot adjudicate the legal rights of a non-party such as Kudler, and cannot therefore bind him to the terms of the decree.

Kudler misapprehends the issues presented by the Amended Decree and the Final EIS. Those documents together settled complex protracted litigation concerning the plaintiffs' statutory and constitutional rights. As mentioned above, plaintiffs sought relief to alleviate serious procedural shortcomings in the I–105 planning process, and to vindicate NEPA's environmental mandate, as well as the federally protected rights of displaced businesses, tenants, and homeowners. The rights at stake in this matter, in short, are those of the plaintiffs, and these rights were vindicated by the Amended Decree.

Kudler, by contrast, does not have an absolute right to erect billboards. Billboards are already subject to extensive limitations as evidenced by Caltrans' regulations governing billboard placement. See COAA § 5200 *et. seq.*

Caltrans, an agency of the State of California, has committed itself to abide by the Amended Decree and the EIS in exchange for the settlement of the plaintiffs' federal claims. Abiding by the Amended Decree is thus a legal contractual obligation on the part of the State of California. This obligation, given the history of this case, is not easily brushed aside by changing interpretations of state regulations. If it were, the State of California could circumvent the consent decree and relieve itself of some of the burdens of this litigation by adopting regulations that conflict with the decree's terms.

## B. All Writs Act and Anti–Injunction Act

This court, moreover, has jurisdiction under the All Writs Act and Anti–Injunction Act.

### 1. All Writs Act

■ Under the All Writs Act, 28 U.S.C. § 1651, this court is empowered to "issue all writs necessary or appropriate in aid of [its] respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). The All Writs Act gives this court authority to issue an injunction to protect its earlier order. *Nowling v. Aero Servs. Int'l, Inc.,* 734 F.Supp. 733 (E.D.La.1990).

Non-party Kudler argues that the state court's ruling regarding the "landscaped freeway" classification does not directly conflict with any specific provision of the Amended Decree. Because this is so, he argues, this court lacks jurisdiction under the All Writs Act. See *Stafford v. Superior Court of Cal. In and For Los Angeles County,* 272 F.2d 407 (9th Cir.1959), *cert. denied,* 362 U.S. 979, 80 S.Ct. 1064, 4 L.Ed.2d 1013 (1960).

■ Yet an important factor in determining whether a court has jurisdiction over a subsequent dispute is whether the issue could have been litigated in the initial action. See *Western Systems, Inc. v. Ulloa,* 958 F.2d

864, 870 (9th Cir.1992). Here, plaintiffs litigated the aesthetic impact of the I–105 project on the surrounding communities and motorists. Plaintiffs could have litigated the minutiae of billboard restrictions, but instead opted to accept the Final EIS's assurances that the freeway would be built with architectural design features and landscaping that would minimize negative aesthetic impacts on the surrounding communities. This court resolved that aesthetic design issue in the Amended Decree, and Caltrans cannot pursue a course of conduct that conflicts with this court's disposition of that issue. *Id.*

### 2. Anti–Injunction Act

■ Kudler also argues that the Anti–Injunction Act, 28 U.S.C. § 2283, prohibits this court from interfering with the enforcement of the state court's writ of mandate. The Anti–Injunction Act mandates that a federal court "may not grant an injunction to stay proceedings in a State court *except* as expressly authorized by Congress, or *where necessary in aid of its Jurisdiction, or to protect or effectuate its judgments.*" 28 U.S.C. § 2283 (emphasis added).

The matter before the court falls squarely within the Anti–Injunction Act's exception that allows a federal court "to protect or effectuate its judgments." *Id.* As discussed below, the state court's ruling contradicts the Amended Decree which designates the entire length of I–105 as a "landscaped freeway."

The state court writ of mandate ordered Caltrans to permit billboards along I–105 even though the Amended Decree and the Final EIS set forth a clear aesthetic vision for the I–105 that is not consistent with billboard development. The state court, by issuing its writ, threatens to unravel the fifteen-year-old settlement agreement set forth in this court's Amended Decree. In enjoining Caltrans from issuing permits to Kudler, the court seeks to protect and effectuate its judgment as set forth in the Amended Decree.

### C. Abstention and Colorado River "Abstention"

Throughout the court's review of this matter, non-party Kudler has asserted that this court should not adjudicate this matter because the California courts are currently reviewing Kudler's state claims. As explained above, this court has inherent jurisdiction to enforce the Amended Decree. *See Kokkonen,* 511 U.S. at 380–82, 114 S.Ct. at 1677. Still, there are some cases in which a federal court either must abstain or may exercise its discretion to stay its proceedings pending resolution of concurrent state litigation. The matter before the court is not one of those cases.

### 1. Abstention

■ It is axiomatic that "[a]bstention from the exercise of federal jurisdiction is the exception, not the rule." *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 813, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976). Federal courts must decide controversies properly before them, and should abdicate that responsibility only when ordering the parties to " 'repair to the State court would clearly serve an important countervailing interest.' " *Id.* (quoting *County of Allegheny v. Frank Mashuda Co.,* 360 U.S. 185, 188–89, 79 S.Ct. 1060, 1063, 3 L.Ed.2d 1163 (1959)).

■ There are three types of occasions when federal courts abstain from hearing a case that parallels an on-going state court proceeding. Abstention is appropriate when (1) determination of a federal constitutional issue might be rendered moot by a determination of state law, (2) the case presents difficult questions of state law that raise substantial public policy issues, and (3) federal jurisdiction is invoked to restrain state criminal proceedings, state nuisance proceedings antecedent to a criminal prosecution, or state tax collection. *Colorado River,* 424 U.S. at 814–16, 96 S.Ct. at 1244–46.

■ The matter involving non-party Kudler does not present any one of these three traditional grounds for invoking abstention. First, there are no federal constitutional questions that are raised in this consent decree enforcement action. To the extent that plaintiffs raised constitutional claims, those were redressed by the Amended Decree and Final EIS. Plaintiff's motion for a prelimi-

nary injunction merely seeks to enforce the terms of the decree by prohibiting Caltrans from issuing billboard permits for the I–105 right of way.

Second, this is not a case directly involving a question of state law. The settlement agreement, like any contract, is interpreted in accordance with the intention of the parties. Rest.2d Contracts § 202(1). As the court points out below, the consent decree does not invoke California regulations to define its terms. Thus, in resolving this dispute, this court need not and does not determine the meaning of California's COAA regulations. Moreover, even if there were a potential for conflict with the state court, this "does not, without more, warrant staying exercise of federal jurisdiction." *Colorado River*, 424 U.S. at 816, 96 S.Ct. at 1245.

Third, this case is neither an on-going state criminal nor tax proceeding. *See, e.g., Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) (criminal case); *Huffman v. Pursue, Ltd.,* 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975) (state nuisance proceeding); *Great Lakes Dredge & Dock Co. v. Huffman,* 319 U.S. 293, 63 S.Ct. 1070, 87 L.Ed. 1407 (1943) (tax collection). Abstention under this third exception is therefore inapplicable.

In short, this case does not fall under the three traditional exceptions to the general rule that a federal court must adjudicate a matter properly brought before it. Nor does this case present facts that would indicate that principles of federalism would be better served by an extension of the abstention doctrine. Federalism is not a one-way street. An injunction that serves to protect a federal order preserves rather than offends notions of federalism. *See Nowling v. Aero Services Int'l Inc.,* 734 F.Supp. 733, 739 (E.D.La.1990) (citing *Southwest Airlines v. Texas Int'l Airlines, Inc.,* 546 F.2d 84, 93 (5th Cir.), *cert. denied,* 434 U.S. 832, 98 S.Ct. 117, 54 L.Ed.2d 93 (1977)). This is especially true where, as here, the federal court order that is placed in jeopardy is one that resolved a complex, decade-long federal-state litigation.

### 2. Colorado River "Abstention"

Under traditional abstention doctrine this court is not free to abstain and must exercise federal jurisdiction. Yet it bears mentioning that in some circumstances a federal court might exercise its discretion to stay its proceedings pending final resolution of an on-going state court action. As the Supreme Court explained in *Colorado River,*

[T]here are principles unrelated to considerations of proper constitutional adjudication and regard for federal-state relations which govern in situations involving the contemporaneous exercise of concurrent jurisdictions, either by federal courts or by state and federal courts. These principles rest on considerations of "wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation."

424 U.S. at 817, 96 S.Ct. at 1246.

This so-called *"Colorado River* abstention" is different from the three abstention exceptions because it establishes a discretionary standard to determine whether a stay of federal proceedings pending the completion of state court proceedings is appropriate. *Colorado River* requires a federal court to consider staying its own proceedings to avoid duplicative litigation, even if a separate basis for federal jurisdiction exists. *Colorado River,* 424 U.S. at 818–19, 96 S.Ct. at 1246–47.

In determining whether to "abstain" under *Colorado River,* a federal court considers four factors: (1) whether the same res is involved; (2) the relative inconvenience of the federal forum; (3) the desirability of avoiding piecemeal litigation; and (4) the order in which the federal and state proceedings were filed. 424 U.S. at 818, 96 S.Ct. at 1246–47. As the Court instructed: "No one factor is necessarily determinative; a carefully considered judgment taking into account both the obligation to exercise jurisdiction and the combination of factors counselling against that exercise is required." *Colorado River,* 424 U.S. at 818–19, 96 S.Ct. at 1247.

In *Moses H. Cone Mem. Hosp. v. Mercury Constr. Co.,* 460 U.S. 1, 28–29, 103 S.Ct. 927, 943–44, 74 L.Ed.2d 765 (1983), the court reaf-

firmed *Colorado River's* fundamental policy concern that duplicative litigation be avoided. The Court, however, explained that the task for a district court was not merely to use the *Colorado River* factors as a checklist; rather, a district court must carefully balance those factors. 460 U.S. at 16, 103 S.Ct. at 937. *Moses* cautioned that the *Colorado River* doctrine is to be applied sparingly, invoked only in "exceptional" circumstances. *Id.* at 25, 103 S.Ct. at 941–42. In determining whether exceptional circumstances exist, the Court advised that the existence of federal-law issues weighed heavily *against* abstention. *Id.* at 23, 103 S.Ct. at 941.

In weighing the *Colorado River* factors in the context of this case, this court has no choice but to exercise jurisdiction. The first two *Colorado River* factors clearly do not apply here because there is no res involved and the Central District of California is as convenient a forum as the Los Angeles County Superior Court.

However, the third *Colorado River* factor—the policy of avoiding piecemeal litigation—counsels against abstention here. As discussed below, this court has supervised this litigation for twenty-five years, the Amended Decree that settled this litigation was formed under the auspices of this court, and that decree stipulated to the continuing jurisdiction of this court over disputes between the parties. Thus, requiring the parties to repair to state court to adjudicate the meaning of this court's Amended Decree increases piecemeal, duplicative litigation.

The fourth *Colorado River* factor—the order of the filings—is easily resolved against abstention. The seeds of this matter were first brought before this court in 1972. After years of litigation in this court, the Amended Decree was filed in 1981. On these facts, the policy of discouraging forum shopping counsels against abstention. After all, Kudler's state action asks a state court to interpret this court's 1981 Amended Decree even though the Amended Decree clearly reserves this court's jurisdiction to interpret and modify the decree. *See Keith,* 784 F.2d at 1460–61.

The case against applying the *Colorado River* doctrine here is strengthened when the federal interests in this litigation are included in the analysis. As explained above, the Amended Decree addressed serious federal constitutional and statutory issues relating to the construction of a federally funded interstate highway. The Amended Decree and the Final EIS set forth the settlement agreement that resolved plaintiffs' claims and allowed defendants to proceed with constructing the I–105.

The Amended Decree allows the parties to return to this court, and only this court, to seek enforcement or modification of the decree's provisions. This court cannot shirk its obligation to the parties to enforce the Amended Decree without calling the enforceability of the entire decree into question. In this context, having weighed all relevant considerations, the court concludes that this is not an "exceptional" case where an exercise of discretion to stay these proceedings would be appropriate.

### III. DISCUSSION

The plaintiffs seek injunctive relief against Caltrans to prevent it from issuing billboard permits to non-party Kudler, pursuant to the state court's writ. They argue that the Amended Decree requires that I–105 be "constructed as a landscaped freeway." They submit that this language clearly designates the entire freeway as "landscaped" and thus billboard-free. But even assuming that this language is ambiguous, the plaintiffs argue that the parties intended that this designation would mean that no billboards would be erected along the freeway's path.

Alternatively, Kudler contends that even if this court has jurisdiction, the Amended Decree's term "landscaped freeway" has a meaning dependent on state regulations, and this court must therefore determine the meaning of the Amended Decree consistently with the California Outdoor Advertising Act ("COAA"), Cal. Bus. & Prof.Code § 5200 *et seq.,* and that Act's regulations. COAA regs. § 2500 *et seq.*

#### A. The Meaning of the Amended Decree's Definition of "Landscaped Freeway"

The Amended Decree states that I–105 "shall be constructed as a landscaped free-

way, and incorporate noise attenuation measures; all as set out in the Final Environmental Impact Statement [EIS] previously filed in this court." Amended Decree at 6. The plaintiffs claim that permitting billboards on I–105 would violate the decree's designation of I–105 as "a landscaped freeway."

As a preliminary matter, non-party Kudler relies on the state court's reading of the consent decree as well as its reading of COAA regulations to support a technical and restrictive understanding of the decree's terms. Kudler asserts that the Amended Decree must have referenced COAA and its regulations when it designated I–105 as "a landscaped freeway."

Yet, the Amended Decree's use of the term "landscaped freeway" alone does not constitute a cross-reference to the COAA regulations. In fact, the Amended Decree never mentions the COAA when it uses the term "landscaped freeway." Nor does it even cite the relevant COAA provisions or regulations. Without such written reference in the Amended Decree incorporating the COAA or its regulations, this court is not required to apply the state court's interpretation of "landscaped freeway."

Moreover, as discussed extensively above, the Amended Decree embodies the settlement agreement to which the parties agreed to be bound. In form, the Amended Decree is a contract. Its substance must be interpreted according to contractual interpretation principles. With this in mind, the court interprets the Amended Decree's term "landscaped freeway" according to (a) the generally accepted meaning of the term, (b) the term when taken in context, and (c) the intention of the parties.

#### a. The generally accepted meaning of "landscaped"

When a contract does not invoke a technical meaning, the terms of the writing must be presumed to have been used in their primary and general acceptation. Rest.2d Contracts § 202(3). A brief survey of the generally accepted definitions of "landscape" supports the plaintiffs' argument that the Amended Decree's term "landscaped free-

way" requires more than what the COAA or its regulations require.

The architectural meaning of "landscaped" is much broader than what the state court's interpretation of COAA's regulations might suggest. According to *The Architecture Book,* "landscape" means "[a] pictoral (and hence perspective) concept of one's on-land surrounds, as opposed to an abstract design idea ... hence the idea of the pictoral or picturesque." Norval White, *The Architecture Book* 173 (1976).

The notion that "landscape" goes far beyond vegetative plantings is confirmed by common-usage dictionaries. One dictionary defines "landscape" as:

> a section or portion of rural scenery, usually extensive, that may be seen from a single viewpoint .... a panoramic view of scenery; *vista* .... to improve the landscape of .... to improve the appearance of (an area of land, a highway, etc.), as by planting trees, shrubs, or grass, *or altering the contours of the ground.*

*The Random House Dictionary of the English Language* 805 (unabridged ed.1973) (emphasis added)

Finally, another dictionary defines landscape as: "a portion of land or territory that the eye can comprehend in a single view including all the objects so seen ... VISTA, PROSPECT." *Webster's Third International Dictionary* 1269 (1981). According to *Webster's,* the verb "to landscape" is defined as "to make a landscape of: to improve by landscape *architecture or gardening.*" *Id.* (emphasis added).

The generally accepted meaning of the word "landscaped" thus appears to include more than just the mere presence of shrubbery. It evokes an aesthetic concern for the preservation of scenery or vistas by architecture as well as by plantings. A "landscaped freeway," then, calls to mind a freeway that preserves, rather than obstructs urban vistas, a freeway that makes use of plantings but also employs architectural measures to achieve a pictoral or picturesque aesthetic effect.

### b. The term "landscaped" in context

The term "landscaped" is "interpreted in the light of all the circumstances, and if the principal purpose of the parties is ascertainable it is given great weight." Rest.2d Contracts § 202(1). When read in context, the term "landscaped freeway" evokes a broad meaning that is consistent with the purpose of the Amended Decree and Final EIS. As discussed above, the 1972 injunction charged the federal and state defendants with formulating an EIS for the I–105 project which would address NEPA's policy concerns, including Congress's mandate to "assure for all Americans, safe, healthful, productive, and *esthetically* and culturally *pleasing surroundings.*" 42 U.S.C. § 4331(b)(2) (emphasis added).

In conformity with the court's order, the Final EIS sets forth a detailed section entitled "AESTHETICS AND AMENITIES." Final EIS at 5–33 to 5–35. As elaborated above in section I B, this section made bold promises that I–105 would minimize any aesthetic disruption of the surrounding communities. The I–105 architects also sought to avoid continuous vegetative plantings, because they feared that such continuity would create monotony for motorists. Final EIS at 5–35. Accordingly, the architects intentionally sought to terminate plantings at elevated sections of the freeway to afford motorists uncluttered vistas of the urban landscape. Indeed, this concern for the preservation of vistas accords with generally accepted definitions of "landscape." Although the Final EIS did not make explicit mention of billboards in the elevated areas, the placement of large [8] billboards at these sections seems inconsistent with the Final EIS's promise to provide "expansive and perhaps occasional dramatic views for motorists." Final EIS at 5–35.

When read in context, especially in light of the assurances made in the Final EIS's section "AESTHETICS AND AMENITIES," it is clear that the Amended Decree's use of "landscaped freeway" entailed more than vegetative plantings along the wayside. For this reason, if there is any meaning to be given to the words "landscaped freeway" that meaning must be broad enough to encompass the aesthetic mitigation measures—both architectural and vegetative—as set forth in the Final EIS.

### c. Intentions of the parties

■ Kudler argues that the Amended Decree is ambiguous as to billboards and that this ambiguity requires that he prevail. But when a consent degree contains ambiguous terms, the court, in interpreting the decree "should consider the original expectations of the parties." *Keith v. Volpe*, 784 F.2d 1457, 1462 (9th Cir.1986); Rest.2d Contracts § 202(5). Here, the clear expectation of the *Keith* parties was that I–105 would be a billboard-free freeway. See Declaration of Carlyle W. Hall (supporting exhibits), filed July 25, 1996 (see especially Rypinski, Phillips, and Solander declarations).

At oral argument, Caltrans stated that it has *consistently denied* all billboard permit applications based on its understanding that the Amended Decree had designated the entire length of I–105 as a landscaped freeway. The parties' stated intention to ban billboards from the I–105 accords with the context in which the Amended Decree was issued. Plaintiffs were understandably concerned that I–105 would adversely affect the surrounding communities. The court doubts that these same plaintiffs would have acquiesced to the settlement agreement if they knew that the proliferation of advertising billboards at major overcrossings would undermine the Final EIS's aesthetic mitigation measures by obstructing I–105's expansive and dramatic views of the urban landscape. As the Supreme Court stated two months before the parties signed the Amended Consent Decree: "[B]illboards by their very nature, wherever located and however constructed, can be perceived as an 'esthetic harm.'" *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 510, 101 S.Ct. 2882, 2893–94, 69 L.Ed.2d 800 (1981).

Based on the record before it, the court concludes that the original parties to the

---

**8.** These billboards will logically have to be quite large. After all, they must be visible to motorists and tall enough to rise above the elevated sections of the freeway.

Amended Decree intended to designate the entire course of I–105 as a billboard-free "landscaped freeway." By agreeing to abide by this promise, Caltrans entered into a contractual obligation that it must adhere to. This is a legal obligation of the State of California, which cannot be brushed aside by changing interpretations of COAA regulations.

## B. The California Outdoor Advertising Act

The COAA governs the placement of outdoor advertising displays, including billboards, along roadways in California. Under the COAA, a developer is not allowed to place a billboard within 660 feet of a freeway unless Caltrans has issued a written permit. COAA §§ 5271, 5350; *People ex rel. Dep't of Transp. v. Outdoor Media Group*, 13 Cal. App.4th 1067, 17 Cal.Rptr.2d 19, *reh'g denied and modified, review denied, cert. denied* 510 U.S. 932, 114 S.Ct. 346, 126 L.Ed.2d 311 (1993). The COAA requires Caltrans to issue a permit if an applicant has complied with the COAA requirements only if the proposed billboard will not violate any other state law. COAA § 5358.

In particular, the COAA prohibits the placement or maintenance of a billboard on property that is adjacent to a freeway section that has been designated a "landscaped freeway." COAA § 5440. Within the COAA, "landscaped freeway" is a term of art, it specifically means that a section of freeway has been planted with "lawns, trees, shrubs, flowers, or other ornamental vegetation." COAA § 5216; COAA regs. § 2502(j),(m),(o). Under COAA's regulations, Caltrans' Chief Landscape Architect is charged with classifying a freeway as landscaped. COAA regs. § 2507.[9]

Under COAA regulations, if a freeway section is planted *continuously* for 1000 feet or more, it qualifies as a "landscaped freeway." COAA regs. § 2511. Overcrossings, canals, and other freeway characteristics that are 200 feet or less in length are not considered

as breaking the continuity of the plantings, and Caltrans does not have the discretion to declassify those sections from their "landscaped" status. COAA regs. §§ 2502(f) & 2511. Even though COAA regulations merely limit Caltrans's discretion to *declassify* freeway sections formerly deemed "landscaped" when gaps in planting continuity are less than 200 feet, *id.*, the state court interpreted those regulations as limiting Caltrans's discretion to *classify* such freeway sections as "landscaped" when gaps in the plantings exceed 200 feet. *Kudler*, No. BC 138916, at 5.

Based on its regulatory interpretation, made outside the historical context underlying the Amended Decree, the state court held that the ten sections of I–105 where Kudler seeks to place his billboards did not meet COAA's requirements for designation as "landscaped freeway." The state court cited the length of the overcrossings and elevated sections, which exceeded 200 feet in length. Those overcrossing areas, the state court explained, were not planted, nor could they ever be planted given their elevated, concrete design. The state court concluded that these areas of I–105 could never be classified as "landscaped freeway." Accordingly, the state court determined that Caltrans had relied improperly on the "landscaped freeway" designation when it denied Kudler the permits. As a remedial measure, the state court issued a writ of mandate ordering Caltrans to issue the permits to Kudler.

## C. The Act Read in the Context of the Amended Decree

The state court correctly points out that the Amended Decree clearly does not refer to COAA's regulations. As interpreted by that court, however, the regulations conflict with the Final EIS's aesthetic vision for the freeway as well as the intention of the parties. In sum, the situation presented here calls for review of the historical and contrac-

9. COAA regulation § 2507 states:
The Director hereby delegates to the Chief Landscape Architect the responsibility to make all classifications dealing with landscaped freeways. If such delegation is hereafter changed,

all references to "Chief Landscape Architect" shall mean whomever is delegated the responsibility of classifying freeways as landscaped freeways.

tual underpinnings of this freeway project, not simply an interpretation of a particular state regulation. The court agrees with Kudler's observation that this court cannot invalidate or rewrite state law in the absence of a constitutional or federal conflict. But as the discussion above indicates, this court does *not* reinterpret the COAA or its regulations—such review is properly left to the California appellate courts. What this court does engage in is an interpretation of its own consent decree. Under traditional contractual interpretation principles, there is ample basis on which to conclude that the Amended Decree mandated that the entire I–105 be built and designated as a billboard-free "landscaped freeway." Because the Amended Decree patently reflects the intention of the contracting parties to build a landscaped freeway, the regulations, at best, merely give Caltrans the discretion to "declassify" certain sections. Here, Caltrans is properly declining to exercise its discretion based on its long-standing contractual obligations as set forth in the Amended Decree.

## IV. ISSUANCE OF A PRELIMINARY INJUNCTION

Having considered the issues presented by this matter, the court now considers whether a preliminary injunction should issue.

### A. Preliminary Injunction Standard

In *Los Angeles Memorial Coliseum Comm'n v. National Football League*, 634 F.2d 1197 (9th Cir.1980), the Ninth Circuit explained that:

> The traditional equitable criteria for granting preliminary injunctive relief are (1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury to plaintiff if the preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4) advancement of the public interest. . . .

634 F.2d at 1200 (citations omitted); *see also State of Alaska v. Native Village of Venetie*, 856 F.2d 1384, 1388 (9th Cir.1988).

The Ninth Circuit has further clarified this standard in Native *Village of Venetie*, explaining that "plaintiffs are entitled to preliminary injunctive relief" if they demonstrate "probable success on the merits," and a "possibility of irreparable injury," or if they demonstrate "a fair chance of success on the merits (i.e., serious questions are raised)," and "the balance of hardships tips sharply in their favor." 856 F.2d at 1389.

### B. Application of the Preliminary Injunction Standard

The court must determine whether plaintiffs have (1) shown a likelihood of success on the merits, and (2) shown that irreparable harm would result if an injunction does not issue.

#### 1. Success on the Merits

The court has concluded that the placement of advertising billboards along any portion of the I–105 would be inconsistent with the language of the Amended Decree and the Final EIS, as well as the intention of the parties. The plaintiffs, therefore, have a strong likelihood of success on the merits.

#### 2. Irreparable Harm

In assessing the possibility of irreparable harm, this court must balance the hardships that would be suffered by each side. On the one hand, Kudler has argued that each day that he is denied billboard permits, he loses advertising revenue. Kudler also asserts, cursorily, that he is suffering an on-going deprivation of his First Amendment right to free expression. To be sure, curtailment of commercial speech is a serious matter, but Kudler has not documented the harm that he will suffer if his right to advertise is regulated. Regulation of offsite advertising billboards has been held to be consistent with the First Amendment. *See Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 512, 101 S.Ct. 2882, 2895, 69 L.Ed.2d 800 (1981) (White, J., plurality opinion) ("offsite commercial billboards may be prohibited while onsite commercial billboards are permitted"). Thus, in with respect to offsite freeway billboards, the First Amendment's protections simply do not sweep so wide. *Id.*

On the other hand, plaintiffs have shown that their local communities would suffer from the unregulated construction of I–105.

Indeed, it is their federal and state rights that have been at stake throughout the history of this litigation. And it was in vindication of these rights that I–105 was completed in accordance with the Final EIS's promise to minimize environmental, economic, and aesthetic harm whenever "practicable."

The balance tips in the plaintiffs' favor when the public interest is considered. The Ninth Circuit has recognized the importance of this court's Amended Decree in dissolving the 1972 injunction and allowing the I–105 to be constructed. *Keith,* 784 F.2d 1457, 1458–59 (9th Cir.1986). Allowing Kudler to place billboards along I–105 ironically jeopardizes the continuing viability of the very settlement agreement that created these perceived billboard opportunities.

Irreparability of harm occurs if billboards are permitted. Once erected, the removal of these billboards becomes subject to yet more litigation. Moreover, a violation of the terms of the decree by Caltrans challenges the court's authority to enforce its Amended Decree and release plaintiffs from their commitments under the decree. The bargain forged by the Amended Decree is important to I–105 corridor communities and their residents, the people of California, and any motorist traveling in this area. For these reasons, the court finds that the public interest is advanced by the issuance of a preliminary injunction.

### V. CONCLUSION

The court finds that plaintiffs have made a strong showing on their claim that Caltrans would violate its obligations under the Amended Decree were it to issue outdoor advertising permits to nonparty Kudler. Therefore, plaintiffs are likely to prevail on the merits. Accordingly, the court GRANTS plaintiffs' motion for a preliminary injunction as follows:

The California Department of Transportation, Gary W. Bush, James W. Van Loben Sels, their officers, agents, servants, employees and attorneys and all those in active concert or participation with each of them are hereby prohibited from issuing any permit to Robert L. Kudler that would allow him to place any billboard or other outdoor advertising displays along the I–105 freeway, including permits allowing him to erect his Proposed Displays 2, 3, 6, 7, 8, 9, 10, 11, 12, and 13.

Finding that there is no just reason for delay, the court directs entry of judgment.

### APPENDIX A

### AMENDED FINAL CONSENT DECREE

WHEREAS, the above-entitled action was filed on February 16, 1972, in the United States District Court, Los Angeles, California, by several individuals who reside in the path of the proposed I–105 (sometimes hereafter "Century") Freeway, the Los Angeles chapter of the National Association for the Advancement of Colored People, the Sierra Club, and the Environmental Defense Fund;

WHEREAS, the complaint alleged that the California Department of Transportation (hereafter "Caltrans"), its Director and officials (hereafter "State defendants") and the United States Department of Transportation, its Secretary and officials (hereafter "Federal defendants") failed to comply with the National Environmental Policy. Act of 1969, the California Environmental Quality Act of 1970, the Urban Mass Transportation Act of 1964, the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, the Federal–Aid Highway Act, and the Fifth and Fourteenth Amendments of the United States Constitution;

WHEREAS, on July 7, 1972, after a hearing on the issues, this court enjoined all activities in furtherance of construction of the I–105 Freeway until such time as State and Federal defendants complied with the applicable requirements of the National Environmental Policy Act of 1969, the California Environmental Quality Act of 1970, the Federal–Aid Highway Act, and the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970;

WHEREAS, State and Federal defendants have, in compliance with the court's order, held additional public hearings on the Century Freeway and completed preparation of a Final Environmental Impact Statement

("EIS"), which EIS has been filed with the above-entitled court;

WHEREAS, the court finds that the defendants have fully complied with applicable requirements of the National Environmental Policy Act of 1969, the California Environmental Quality Act of 1970, the Federal–Aid Highway Act, and the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, and the terms of the preliminary injunction heretofore entered by this court on July 7, 1972;

WHEREAS, the court finds that the Housing Plan, attached hereto as Exhibit B, is in full mitigation of the environmental impacts on housing stocks resulting from the I–105 Freeway project;

WHEREAS, plaintiffs have reviewed the Final Environmental Impact Statement to determine whether to challenge. its adequacy in light of the requirements of the National Environmental Policy Act of 1969 and the California Environmental Quality Act of 1970;

WHEREAS, plaintiffs and State defendants and Federal defendants have agreed to settle all claims in this action;

WHEREAS the purposes of the Decree are to permit the I–105 Freeway to be built so long as it incorporates the design features and support facilities described by the Decree, including six lanes for general traffic and two transit/hov lanes, ten transit stations, ten park-and-ride facilities and ramp metering; to provide that State and Federal defendants will use their best efforts, consistent with applicable law, to authorize and provide funds for a bus or rail transitway with supporting facilities on the Harbor Freeway with capability for a link to the I–105 Freeway; to assure that the housing stock which is in distinguishably short supply in the affected communities is not depleted and to provide for the housing needs of those living in the area of the proposed path of the freeway; to ensure that employment opportunities generated by the project will benefit the communities which have been economically impacted by the size and location of the project; and to avoid further costly and lengthy delays from litigation or otherwise;

WHEREAS, for and in consideration of the mutual promises of plaintiffs and State and Federal defendants and conditioned upon the undertakings set forth herein, the parties have agreed to settle this litigation under the terms of this Decree;

WHEREAS, the following exhibits are attached hereto and incorporated as terms of this Decree:

(a) Exhibit A, referred to as "LACTC SCRTD Commitments," is the commitments made by the Los Angeles County Transportation Commission ("LACTC") and the Southern California Rapid Transit District ("SCRTD") for the necessary financial allocations to fund the required local share for transitway support facilities and operating costs.

(b) Exhibit B, referred to as the "Housing Plan," is that relocation housing plan describing the housing which will be provided pursuant to this Decree.

(c) Exhibit C, referred to as the "Employment Action Plan," is that affirmative action plan which will provide employment opportunities for minority citizens and residents of the communities affected by this project.

WHEREAS, the parties have met to discuss the cost of the project as originally designed and limitations on available resources, and have reached the conclusion that modification of the project is desirable in the interest of cost reduction and have agreed upon certain modifications in the Decree originally entered in this case, which modifications are acceptable to the court;

WHEREAS, the court has been fully informed of the facts and circumstances;

NOW, THEREFORE, IT IS HEREBY STIPULATED, ORDERED, ADJUDGED AND DECREED that:

In view of the EIS and the terms contained in this Decree, the parties agree that the injunction heretofore entered by this court on July 7, 1972 shall forthwith be dissolved.

This court shall retain jurisdiction of this matter, until the Judgment of Dismissal is entered pursuant to the terms of this Amended Decree.

## I. *I–105 FREEWAY—DESIGN AND OP-ERATION*

The I–105 Freeway shall be constructed as proposed in the Final Environmental Impact Statement on file with the above-entitled court, except as modified by the specific provisions of this decree.

### A. *Six–Lane Controlled–Access Highway*

A freeway transit facility, including a transitway as described in paragraph I.B. below, approximately 17 miles long, running west to east in the County of Los Angeles from the vicinity of the Los Angeles International Airport to the San Gabriel River Freeway (Route 605) shall be built. It shall contain six lanes for general traffic with a basic median width not to exceed 64 feet (except where necessary to provide for such facilities as stations and bridge columns), which will contain a separate transit/hov facility which will be convertible to operation of a light rail transit facility. The freeway will have ramp meters as necessary, to be built and installed and operational when the freeway opens. Such metering will be operated by State defendants, and will regulate flow of traffic onto the freeway according to traffic conditions to minimize congestion. The I–105 Freeway shall be constructed as a landscaped freeway, and incorporate noise attenuation measures, all as set out in the Final Environmental Impact Statement previously filed in this court.

The design will include four freeway-to-freeway interchanges and ten local interchanges, to be constructed in the immediate vicinity of the ten transit stations in the approximate locations depicted in Exhibit D and referred to in paragraph I.D. below. Termination facilities interchanging with the surface street system shall be constructed at the easterly and westerly termini of the freeway.

### B. *Transit/High–Occupancy Vehicle ("HOV") Lanes*

Transit/High–Occupancy Vehicle (HOV) lanes carrying buses and carpools in the median of the freeway shall be incorporated into the initial construction of the freeway and shall be operational at the time the freeway is opened to traffic. (These lanes may hereafter be referred to as a "transitway.") Although the transitway is presently designed for buses and carpools, the facility shall be designed to be convertible to light rail. Nothing in this Decree shall preclude the substitution of light rail as an alternative mode of public transportation for the bus/HOV/carpool facility which would otherwise have operated within the transitway.

The design will include provision for a transit/HOV connection to the Harbor Freeway although this connection will not be included as part of the initial construction of the I–105 project. Plaintiffs do not favor the use of buses as permanent or long-term public transportation in Los Angeles. Plaintiffs would prefer to have the light rail alternative constructed from the beginning but recognize the limitations on funding.

In the event State defendants find that a rail alternative is appropriate, State defendants may modify the project without court order to provide:

(a) for a light rail facility as a substitute for the busway/HOV/carpool obligations contained herein; (b) that the light rail transitway will be completed at a time certain, which date may be after the freeway is opened to automobile traffic; and (c) that FHWA will participate in the initial construction of a light rail and transit station facility only to the extent of the costs of the (i) transit/HOV facility/carpool facility described in this Paragraph B; and (ii) the support facilities described in Paragraph D at page 8.

### C. *Transit Operating Costs*

Operating costs for the buses which will use the transitway shall be provided by local transportation sources. Such funds may include funds from the Federal Urban

Mass Transportation Administration ("UMTA"). A commitment to allocate such funds has been made by the LACTC and SCRTD by letters attached as Exhibit A, and incorporated herein by reference. Levels of service shall be established and supported by sufficient funds as set forth in Exhibit A. It is further agreed that the plaintiffs and defendants shall take all reasonable steps to enforce the commitments secured from the appropriate agencies that buses shall be operating when the entire I–105 Freeway is open to traffic.

### D. Support Facilities for Transit/HOV Lanes

Support facilities for the transitway shall be built and shall be operational at the opening of the freeway. Such facilities shall consist of not more than ten transit stations, designed and built to be convertible to rail stations if necessary in the future, to be constructed with their attendant loading platforms, pedestrian access-ways and park-and-ride facilities. These stations will be at the approximate locations depicted in Exhibit D.

Funding for such facilities shall be included in freeway project costs covered by Federal–Aid Interstate funds to the full extent budgeted by Congress. In the event that transit station facilities are constructed more elaborately than the loading platforms, pedestrian access-ways and park-and-ride facilities provided for in this Paragraph D as a project cost, then the additional cost shall be provided by Federal funds from UMTA, if available, and local matching funds from the LACTC. By Exhibit A, incorporated by reference, these local funds have been committed. If the local transit agencies involved do not honor these funding commitments, upon petition by and consultation with plaintiffs' counsel or State defendants, the United States Secretary of Transportation may, based upon a written statement of reasons, cut off discretionary funding to those local agencies for other transportation purposes in an amount equivalent to those unfulfilled obligations.

Caltrans shall consult with the intervenor Cities herein in regard to the location and configuration of the support facilities within their respective jurisdiction as well as the conventional freeway facility.

### E. Connection Between Century Freeway and Los Angeles International Airport ("LAX")

Access shall be provided from the freeway to LAX.

State defendants shall work with the Los Angeles Department of Airports to develop a plan to facilitate access from the freeway to LAX. Priority access to LAX may be provided for buses and carpools to the maximum extent possible. The resultant plan shall be incorporated into the initial construction of the freeway.

## II. HARBOR FREEWAY LINKAGE

### A. Bus or Rail Transitway on Harbor Freeway

To the extent consistent with applicable state and federal laws, the Federal defendants will use their best efforts to authorize and provide funding for a transitway on the Harbor Freeway from the proposed intersection with the I–105 Freeway to a point approximately 7.5 miles north. When federal authorization and funding has been provided, the State defendants shall construct this transitway. It is intended that this transitway be funded from the Interstate Highway Trust Fund. Although the transitway is presently designed for buses and carpools, the facility shall be suitable for transition to rail. Nothing in this Decree shall preclude the substitution of rail for buses as an alternative mode of transportation. The transitway, therefore, shall be built in such a way that engineering, design and physical features necessary in the event of conversion to rail are incorporated into the initial construction to the fullest extent feasible. The design of this transitway shall provide for direct linkage to the Century Freeway transitway. This transitway shall be funded by Federal–Aid Interstate funding. State defendants shall make their best efforts to obtain said funding and to have

said transitway operating at the same time as the I–105 Freeway is opened to traffic. Provided State defendants make their best efforts, the funding, commencement of construction and operation of said transitway is not a condition to the construction and operation of the I–105 Freeway.

B. *Support Facilities for Transitway*

Passenger stations, passenger loading platforms, pedestrian access-ways, and park-and-ride facilities comparable to those provided for the I–105 Freeway will be provided. Funding for these facilities will be made available in the same fashion as for the I–105 Freeway, as provided in Paragraph I. D., pages 8 and 9 above.

III. *REAL PROPERTY ACQUISITION AND RELOCATION ASSISTANCE: ESTABLISHMENT OF AN "OFFICE OF THE ADVOCATE FOR CORRIDOR RESIDENTS"*

All property acquisition and relocation activities shall be in compliance with the relocation assistance requirements of 42 United States Code, section 4601 et seq., 23 Code of Federal Regulations, section 740.1 et seq., and 24 Code of Federal Regulations, section 43.1 et seq., if applicable, and 25 California Administrative Code sections 6150–6176, except insofar as the State and Federal defendants have committed by the terms of this Decree to exceed the minimum requirements set forth under these applicable statutes and regulations.

There shall be created an Office of the Advocate for Corridor Residents ("Office"). All funding for the Office as authorized by the budget shall be provided in the same manner as any other project cost. The individual in charge of said office is referred to herein as the "Advocate" who shall be selected by and serve at the pleasure of the plaintiffs. Upon motion by any of the defendants and by good cause shown, the Court may remove the individual serving as the Corridor Advocate. The Advocate shall be compensated at the same level as a senior right-of-way agent. The Advocate initially shall have authority to hire two additional staff people, one at a salary level comparable to that of an associate right-of-way agent (State of California) and one at a salary at least equivalent to that of a stenographer Range B (State of California). Caltrans shall be responsible for underwriting all reasonable costs associated with the operation of the Advocate's Office necessary to perform all duties assigned to it by this Decree. The Office of the Advocate for Corridor Residents is not an agency of the federal government for any purpose. At any time when requested by the Advocate, Caltrans or plaintiffs, or on his own initiative, the Director of Housing and Community Development may review the staffing needs of the Advocate's Office to determine whether demands placed on the Office require its expansion or reduction. If Caltrans or plaintiffs believe that the staff and budget increases or decreases authorized by the Director of Housing and Community Development are not supportable based upon demonstrated or projected demands on the Advocate's Office, the Director of Caltrans or plaintiffs may appeal to the Secretary of Business, Transportation and Housing whose judgment shall be final.

The Office shall have assigned to it the following duties and responsibilities:

A. To establish a local office in the general area where the remaining displacees reside and in a location reasonably convenient to public transportation. The office will be open during hours convenient to the persons to be relocated, including evening hours when necessary. Notice of the existence of the office and its hours shall be included in all State defendants' communications with displacees including the first notice.

B. To monitor State defendants' compliance with all applicable state and federal regulations pertaining to the relocation rights of displacees. Such monitoring shall include but not be limited to review and comment upon the draft texts of notices and information sheets to be supplied to displacees. It shall review and comment upon the strategy for notification and advising of tenants of rental units of their eligibility for benefits.

C. To receive and record all displacee complaints.

D. To provide, upon request by any displacee, any information relevant to the displacee's relocation benefits under applicable federal and state laws and regulations.

E. To assist displacees who have claims or complaints arising out of determination of eligibility, the amount of payment they will receive, or the provision of adequate replacement housing. State defendants shall make available. all relevant information concerning a particular displacee upon request by the Office.

F. To assist displacees in resolving any disputed claim with Caltrans by seeking conciliation, review, or appeal of a decision by State defendants consistent with the procedures set forth in 25 California Administrative Code, sections 6150–6176, in those instances where the Advocate determines that the displacee's claim has merit.

G. To prepare and file with plaintiffs, Caltrans, and Housing and Community Development quarterly reports on the activities of Advocate. The report shall indicate:

1. The number and type of corridor resident complaints;

2. Perceived patterns, if any, of violation of laws or regulations by Caltrans; or perceived misinterpretation; of laws or regulations by Caltrans; and

3. The disposition, if any, of said complaints or perceived violations or misinterpretations.

H. To request Caltrans to correct any claims of significant widespread noncompliance and to submit recommendations, if any, for correction. (To the fullest extent possible, the Advocate shall have direct access to the highest level of Caltrans administration when field staff is either unable to or will not resolve conflicts arising with current corridor residents.)

Plaintiffs may petition this court for judicial review using appropriate judicial standards to compel compliance after the above-described method of conflict resolution has been followed, which, in the judgment of plaintiffs, has not resulted in termination of the alleged significant widespread noncompliance. Plaintiffs may also seek declaratory relief from this court interpreting the law or any regulation which the Advocate believes is being misapplied by Caltrans. Plaintiffs shall not have the right to seek judicial relief for individual corridor residents. However, evidence showing cumulative individual experience may be offered for the sole purpose of tending to prove alleged significant widespread noncompliance by Caltrans.

### IV. HOUSING PLAN—REHABILITATION AND RELOCATION OF UNITS PRESENTLY OWNED AND TO BE ACQUIRED BY STATE DEFENDANTS

Exhibit B entitled "Development and Implementation of Housing Plan" as modified herein by agreement of the parties is attached hereto and incorporated by reference.

### V. EMPLOYMENT ACTION PLAN

As assurance of their intent to provide employment opportunities for women and minority citizens and residents of the communities affected by this project, defendants shall initiate and complete the Employment Action Plan which is attached hereto as Exhibit C, and incorporated herein by reference.

### VI. AMENDMENT TO AND ENFORCEMENT OF FINAL CONSENT DECREE

Upon noticed motion and opportunity to any party to object, this Amended Decree may be modified or amended if plaintiffs' counsel and State and Federal defendants to this litigation agree in writing with the approval of this court. As part of its inherent power, the court may modify this Amended Decree upon motion by either plaintiffs or Federal defendants or State defendants.

If the terms of this Amended Decree are not complied with by any party, then any party may apply to this Court for appropriate relief.

This court shall issue an injunction to enforce any terms of this Amended Decree only as a last resort remedy and only when no other remedy would reasonably assure compliance with a significant term. When selecting a remedy for noncompliance, if any, with the terms of this Amended Decree, to the extent that effective enforcement of a significant term of the Amended Decree permits, a primary consideration shall be to avoid delay of the construction, completion, and ultimate opening and operation of the freeway or implementation of the housing program.

## VII. NONSEVERABILITY OF DECREE'S PROVISIONS

In the event that any of the material portions of the project as described in the Amended Decree are declared invalid and enjoined, plaintiffs, Caltrans or Federal defendants may seek an injunction against the implementation of the remaining portion of the project as described in the Amended Decree. Should the invalidity be upheld on appeal, Caltrans, plaintiffs or Federal defendants shall have the right to seek dissolution of the Amended Decree and to pursue all available legal claims.

## VIII. TERMINATION OF COURT JURISDICTION

Upon motion to the court setting forth a description of how all terms of this Consent Decree have been fully complied with, and absent objection thereto, a Judgment of Dismissal shall be entered by the court. If opposition is filed, then the motion shall be heard in the ordinary course.

## IX. ATTORNEYS' FEES

Upon entry of the Final Consent Judgment, plaintiffs may within thirty (30) days file an application with this court for reasonable attorneys' fees which are to be paid by State defendants. The State defendants shall have thirty (30) days to respond, and plaintiffs may file a reply within fifteen (15) days later. If requested by either party, the court shall calendar the matter for hearing within fourteen (14) days after the request. After the court makes its determination and

order, Caltrans shall pay any award within a reasonable time. If, for any reason, the fee award is not paid (a) within a reasonable period of time, or in the alternative, (b) as provided in the manner set out hereafter in the event of appeal, then no funds shall be expended in furtherance of the I–105 project. It is understood that both plaintiffs and defendants may appeal the amount of the award. In the event of an appeal, then there shall be paid to plaintiffs within a reasonable time 75% of the amount awarded and the balance of the award shall be deposited in an interest bearing escrow or trust account. In the event that an appeal results in a reduction of the award then defendants shall recover any reduction of the award (a) first, from the escrow or trust account, and (b) second, from the Center for Law in the Public Interest, if insufficient funds are in the escrow or trust account. In the event that an appeal results in no reduction of the award, the balance in the escrow or trust account (including accumulated interest) shall be paid to the Center for Law in the Public Interest. In the event that the award is increased as a result of appeal, then Caltrans shall pay the Center whatever increase in the award may be ordered by the court. Other than the funds deposited in the escrow or trust account, any funds recovered by defendants or any fees paid to the Center shall include interest based on the average Prime Rate from the date of the award or the date of payment to the Center, whichever is applicable.

The Federal defendants may appear in the litigation or settlement of any issue regarding attorneys fees.

Plaintiffs are aware of and in accord with the terms of this section.

## X. FEDERAL PARTICIPATION

Federal defendants will be participating in the cost of the I–105 project in the same manner as any other interstate freeway project cost. Because the unique size and geographical location of the I–105 project will have a significant effect on low-income housing stock and employment, certain features of this Decree are unique to the I–105 project. Set out hereafter are the most obvious

provisions of this Decree including the Housing and Employment Action Plans which Federal defendants agree are project costs entitled to federal participation:

1. Housing project as provided for in the Housing Plan, Exhibit B, as amended and modified by agreement of the parties: State defendants, acting by and through the State of California, Department of Housing and Community Development (HCD), agree to use their best efforts to rehabilitate existing housing within the corridor to implement the Housing Plan. It is understood, however, that housing approved by the Federal Highway Administration subsequent to August 25, 1981, may be either new construction or rehabilitation at the option of the State of California, Housing and Community Development or its successor as may be designated pursuant to this Decree;

2. Housing Project Director: Cost of operation including staff;

3. Housing Advisory Committee: Cost of operation including staff;

4. Office of the Corridor Advocate: Cost of operation including staff;

5. Century Freeway Affirmative Action Committee: Cost of operation including staff;

6. Vacant Excess Land: No credit to federal funds shall be required for vacant land previously acquired by Caltrans for the I–105 which has become or will become excess land and which is made available for sites to meet the replacement housing obligations contained in this Decree;

7. Rehabilitation in Excess of HUD standards: Incremental Costs occasioned by construction in excess of HUD standards where determination made that long-term benefits of such higher standards will outweigh any additional costs involved;

8. Reasonable moving expenses for 180–day post-acquisition tenants as set forth in Paragraph IV. H. 1 of the Housing Plan, Exhibit B herein;

The above list is not intended to be exclusive, but is solely an effort to fix responsibility for participation clearly as to the matters listed. Whether Federal defendants will participate in a particular unanticipated future project cost not listed shall be determined by resort to federal law and regulations and, if applicable, to the intent of this Amended Decree. In addition to the above-special items Federal defendants will participate in the project cost of the I–105 Freeway as described in the final Environmental Impact Statement on file with the above-entitled court, except as set forth herein, including the transit/HOV facilities described herein.

I. Plaintiffs:
 A. CENTER FOR LAW IN THE PUBLIC INTEREST
 By /s/ John R. Phillips Date Sept. 22, 1981
 JOHN R. PHILLIPS
 Attorneys for Plaintiffs Ralph W. Keith, et al.

II. Federal Defendants:
 A.
 By /s/ Robt. M. Garrick Date 9/22/81
 ROBERT M. GARRICK,
 Rear Admiral, USNR (Ret.)
 Deputy Counselor to the President
 B.
 By /s/ Donald L. Ivers Date 9/22/81
 DONALD L. IVERS
 Chief Counsel,
 Federal Highway Administration

1364

C.

By /s/ Michael E. Wolfson _____ Date ___9/22/81___
 MICHAEL E. WOLFSON
 Assistant U.S. Attorney

D.

By /s/ _____ Date _____
 ~~CAROL DINKIN~~
 Assistant Attorney General
 Land and Natural Resources Division
 U.S. Department of Justice

III. State of California Defendants:

A. BUSINESS, TRANSPORTATION AND HOUSING AGENCY
 STATE OF CALIFORNIA
 By /s/ Lynn A. Schenk _____ Date ___9/22/81___
 LYNN A. SCHENK
 Secretary

B. DEPARTMENT OF TRANSPORTATION
 STATE OF CALIFORNIA
 By /s/ Adriana Gianturco _____ Date ___9/22/81___
 ADRIANA GIANTURCO
 Director, Department of Transportation

C. DEPARTMENT OF TRANSPORTATION
 STATE OF CALIFORNIA
 By /s/ Richard G. Rypinski _____ Date ___9/22/81___
 RICHARD G. RYPINSKI
 Attorney for Defendant
 State Department of Transportation

IV. Intervenor:

A.

By /s/ Royal M. Sorensen _____ Date ___9/22/81___
 ROYAL M. SORENSEN
 Attorney for Intervenor
 CITY OF SOUTHGATE

The court having been fully apprised of the
facts and circumstances hereto, IT IS SO
ORDERED.

## EXHIBIT A

**LOS ANGELES COUNTY TRANSPORTATION COMMISSION** • 311 SOUTH SPRING STREET – SUITE 1206, LOS ANGELES, CALIFORNIA 90013 • (213) 626-0370

March 29, 1979

JEROME C. PREMO
EXECUTIVE DIRECTOR

Mr. John R. Phillips
Center for Law in the
 Public Interest
10203 Santa Monica Boulevard
Fifth Floor
Los Angeles, CA 90067

Dear Mr. Phillips:

I am writing in response to your January 9, 1979 letter
requesting the Los Angeles County Transportation Commission
to commit future funds available to it for certain transit
purposes. This request relates to satisfaction of certain
conditions which now preclude work on I-105 from proceeding.
Of course, we are sure you recognize that the Los Angeles
County Transportation Commission is not a party to the
existing court injunction on I-105.

At its March 14, 1979 meeting, the Commission unanimously
endorsed the recommendation of its Finance Review Committee,
to support programming of transit capital funds for certain
station facilities on I-105, and for transit operating
costs and service levels for I-105. Attached is an excerpt
from the minutes of the March 14 meeting, which references
this action. The Commission is authorized to program local
funds under Sections 130303(b) and 130306 of the Public
Utilities Code. Also attached is a February 5, 1979 letter
from Jack R. Gilstrap, Southern California Rapid Transit
District General Manager, concurring in the settlement
terms as they affect the District.

The Commission is now reviewing the proposed State Trans-
portation Improvement Program (STIP) of Caltrans for the
FY 79/80 through FY 83/84 period, in accordance with the
provisions of AB 402. Principal among new construction
projects proposed in Los Angeles County during this period
is the initiation of actual construction for I-105. The

Mr. John R. Phillips
March 29, 1979
Page 2

Commission's main concern in considering I-105 is in its
time schedule for implementation. Obviously, final design,
land acquisition and construction cannot proceed until the
court injunction is lifted and a final go-ahead is granted.
Accordingly, we sincerely hope and urge that remaining
issues precluding a court settlement can be resolved promptly,
and work can finally proceed.

Please let me know if I can be of further help on this.

Sincerely,

*Jerry Premo*

JEROME C. PREMO
Executive Director

JP:kyt
Attachments

1366

## EXHIBIT B

Southern California Rapid Transit District
425 South Main St. Los Angeles. California 90013
Telephone: (213) 972-6000

JACK R. GILSTRAP February 5, 1979
General Manager

Jerome C. Premo, Executive Director
Los Angeles County Transportation Commission
311 South Spring Street, Suite 1206
Los Angeles, California 90013

Dear Mr. Premo:

We have reviewed the proposed terms of settlement prepared by the
Center for Law in the Public Interest incidental to the legal action
against the construction of the Century Freeway.

In calling for a commitment from the Los Angeles County Transporta-
tion Commission to provide funds supporting service at a level consist-
ent with projected demand on the facility and surrounding travel corridor,
the agreement also provides that the Southern California Rapid Transit
District will make a determination of such service levels, with the
concurrence of the Commission. Additionally, should it be proposed
that the number of stations and/or support facilities presently planned
be reduced, it is understood that any such reduction would be subject
to DOT, Caltrans, LACTC and Southern California Rapid Transit
District concurrence after notice and consultation with Plaintiffs'
counsel.

Also inherent to the terms of the settlement is the understanding that
the Commission and the District will work together to the extent neces-
sary to ensure our awareness and support of the requested local com-
mitments.

The purpose of this letter is to give you the assurance that the Southern
California Rapid Transit District sees no problem with the general terms
of the proposed settlement as it pertains to the level of District service.
We look forward to working with the Los Angeles County Transportation
Commission on this project and will cooperate with you in every way
possible.

Sincerely,

Jack R. Gilstrap

LACTC Minutes -2- March 14, 1979

have Mr. Premo as Executive Director, as he has an extremely good rapport with these people and that the Commission should take more advantage of that capability and that the Commission should send him to Washington as often as possible to lobby for the Commission.

Committee Reports

Finance Review Committee

Commissioner Tweedt reported on the committee's actions at the March 12 meeting. The following are recommendations from that meeting (EXHIBIT A):

- Authorization for the Executive Director to indicate the Commission's intention to commit funds for the Century Freeway transit capital improvements and operations, in response to a request from the Center for Law in the Public Interest.

- Approval of Caltrans' request for FY 78-79 Type I TIP for:

 a. Right-of-way acquisition for Route 91/11.

 b. A change in the fund category for the Kanan Road.

 c. Preliminary engineering and environment assessment funding for Santa Ana Freeway and Harbor Freeway transit element.

- Authorization for the Chairman to appoint a Commission member and staff member for the Route 30 Study Advisory Committee.

- Approval of distribution of discretionary funds and fund type within the SCAG region.

- Approval of the intercounty allocation of UMTA Section 5 bus capital funds, which provides for 84% to Los Angeles County, 12% to Orange County, and 2% to San Bernardino County; it is also recommended that a special committee, similar to the one working on highway matters, be set up to work on bus allocation funding to begin in 1981.

---

*AMENDED EXHIBIT B*

## DEVELOPMENT AND IMPLEMENTATION OF HOUSING PLAN

### I. INTRODUCTION

This Exhibit sets forth terms and details of the commitments of the State and Federal defendants for the provision of housing as part of the I–105 project in order to replenish the housing stock of communities affected by the freeway and to relocate persons now residing within the right-of-way.

After careful consideration and study of the housing market in the vicinity of the I–105 project, the needs of potential displacees now residing in the corridor, and available Federal and State resources, the parties have agreed that the housing portion of the I–105 project will consist of the following three major elements:

a. The State defendants (as used hereinafter in Exhibit B, "State defendants" shall mean the State of California, acting by and through the Department of Housing and Community Development (HCD) or its successor as may be designated pursuant to this Decree) will provide, through rehabilitation or new construction, 1,025 units of housing pursuant to approvals given by the Federal Highway Administration prior to August 25, 1981. These units will be made available to eligible purchasers or renters in accordance with paragraphs A, B, C, and D of Section IV of this Exhibit.

Federal funds for provision of said housing shall be provided for under appropriate expedited procedures to be approved by FHWA.

b. The State defendants will, at the earliest possible date, construct or rehabilitate with Federal participation not fewer than 1,175 units to meet the housing needs of corridor residents eligible for benefits under the Relocation Act. These 1,175 units represent the parties' estimate of "last resort housing" requirements of the remaining eligible residents on the I-105 right-of-way. Residents displaced from the corridor will be afforded an opportunity to acquire or rent these units of housing pursuant to the last resort housing provisions of the Uniform Relocation Act. Those units not accepted by corridor displacees will be made available in accordance with paragraphs A, B, C, and D of Section IV of this Exhibit. Displacees not electing to accept these units will be relocated under the Uniform Relocation Act procedures. Federal funds for provision of said housing shall be provided for under appropriate expedited procedures to be approved by FHWA.

c. The Federal defendants will authorize, pursuant to 23 U.S.C. 106, Federal participation in the amount of $110 million for the provision of housing units by the State defendants who will produce the maximum number of housing units which can be obtained with these funds under expedited procedures to be approved by the Federal Highway Administration. Expenditure of these funds will be subject to a final federal audit for consistency with the approved procedures as well as management effectiveness. One year following the execution of the commitment under 23 U.S.C. 106 referred to above, the Federal Highway Administration will provide a supplemental authorization for the construction of housing in a sum to be computed by multiplying the then unexpended portion of the $110 million times the percent change in the construction cost index of new one-family houses. The Boeckh Residential Cost Index as published in Construction Review compiled by Bureau of Industrial Economics, United States De-

partment of Commerce, shall serve as the cost index. The Federal Highway Administration will not execute any additional supplemental authorizations calculated in this manner unless a clear and convincing showing is made by the State defendants and approved by the Federal Highway Administration that the housing was not constructed due to circumstances beyond the control of the State defendants. On petition of any party, the court may review the FHWA decision in order to determine whether its refusal to provide any additional or supplemental authorizations was reasonable. These units will be made available in accordance with the provisions of paragraphs A, B, C, and D of Section IV of this Exhibit. Any funds received by the State defendants in the course of disposing of these units shall be used for the construction of additional low- and moderate-income housing but not subject to the inflation factor.

II. *STAGING AND REVIEW*

A. *Introduction.*

It is the intent of the parties to allow the freeway project to begin before any housing is actually relocated or replaced and available for occupancy. In order to allow freeway construction to immediately proceed and assure that at the end of the project all housing provided hereunder will be available, the following Staging Plan is established. Because unforeseen problems with the housing program are a possibility, a Review Plan is established which would allow for modification of the timing and scope of the delivery of the housing program.

B. *Staging Plan.*

The parties agree that with respect to both the highway and housing portions of this project, time is of the essence. The freeway project shall be phased so that a given percentage of housing units will be available for occupancy when a given percentage of the freeway construction contracts are awarded.

The freeway construction contract percentage figure shall be expressed as the

relationship between the dollar value of awarded contracts at a given time, to the total estimated freeway construction cost in constant dollars. The housing percentage figure shall be expressed as the relationship of housing units available for occupancy to 3,700. Said phasing schedule shall be:

1. Phase 1. Twenty-five percent of the freeway construction contracts may be awarded prior to any housing being made available;

2. Phase 2. When 50% of the freeway construction contracts have been awarded, at least 30% of the housing units shall be available for occupancy;

3. Phase 3. When 75% of the freeway construction contracts have been awarded, at least 60% of the housing shall be available for occupancy; and

4. Phase 4. At the time that freeway construction is complete, all of the remaining housing units shall be under construction contract.

## C. *Review Plan.*

At any time after 2,000 units of housing are in place or after 75 percent of the freeway construction contracts have been awarded, whichever comes first, a review of the housing program may, at the petition of Caltrans or Federal defendants, be conducted by this court.

The purpose of such review should it be sought will be to assess, in light of the experience acquired in the implementation of the first phase of the housing program, whether the timing and scope of the housing program, as outlined by this Amended Decree, remain a realistic, reasonably achievable goal.

If such review be sought, the court shall examine whether housing can be made available within the time period reasonably consistent with the phasing program herein. The parties now anticipate that the Housing Plan can be implemented, according to the schedule proposed in this Amended Decree, reasonably concurrent with the construction of the freeway without resulting in undue delays, unreasonable project costs, or excessive impacts on existing communities and their infrastructure. All parties recognize, however, that some additional delay and expense will occur due to the housing program and that acceptance of such delay and expense is among the elements of settlement.

In making its determination regarding the progress of the housing program, the court applying appropriate judicial standards shall consider the following:

1. The extent to which implementation of the housing program has resulted in undue delay in construction of the freeway;

2. The term "undue delay" as used herein is defined to mean delay which:

a. adds significantly to the cost of the freeway project over and above the cost that would have been incurred had the project proceeded according to the original project schedule;

b. adds significantly to the estimated time of completion of the freeway project;

c. results in or probably will result in a suspension of work on the freeway project by freeway contractors or creates conditions or circumstances such that it would be impracticable or impossible for the freeway contractor to proceed with the "current controlling operation of the work" or which otherwise would subject the state to a claim by the freeway contractor for interference, hindrance, or delay. The phrase "current controlling operation of the work" means that work or operation being performed by the contractor which, if delayed, will delay the time of completion of the contract (Standard Specifications 8–1.06, State of California, Department of Transportation, January 1978);

3. The ability of communities to which housing has been and is anticipated to be relocated pursuant to the housing program to absorb such housing without unforeseen and excessive adverse impacts on their infrastructure,

such as schools, sewers and public services;

4. The necessity for, and availability of, federal, state or local government housing subsidy programs to make possible the operation and maintenance of relocated housing units at the income levels described herein once such units are ready for occupancy;

5. The effectiveness of the housing program as evidenced by the substantial occupancy of the units by eligible purchaser/occupant categories;

6. Any other factors which the court deems pertinent to its examination.

The court, after a duly noticed hearing upon the petition of Caltrans or the Federal defendants, shall determine, using the above criteria, whether good cause exists for:

1. Amendment of the Consent Decree to allow freeway completion and operation to occur prior to completion of the housing program; or

2. Any other adjustment to the Housing Program including timing and scope which the court finds to be reasonable under the circumstances.

If such cause is found to exist, the court may make such adjustments as it finds reasonable. In determining what remedy may be appropriate, the parties intend that a strong preference be given to extending the time period for construction or rehabilitation of housing units rather than reducing the number to be provided.

III. *STRUCTURE FOR PLANNING AND IMPLEMENTATION*

A. *General Organization Structure.*

An organizational structure shall be established to plan and implement the housing program which shall include participation by a Project Director and staff, Caltrans, California Department of Housing and Community Development (HCD), a Housing Advisory Committee (HAC) with a Steering Committee, and federal agencies as appropriate.

HCD shall be the lead agency responsible for the coordination and the implementation of the Housing Plan. Caltrans and any other public or private agencies may enter into contracts with HCD for support services. If the Secretary and plaintiffs, upon consultation with Federal defendants, jointly determine that the lead agency has not performed adequately in implementing the Housing Program, the Secretary of Business, Transportation and Housing with the concurrence of the plaintiffs may redelegate the lead agency function.

B. *Project Director and Staff.*

The Project Director shall be selected by the Director of HCD. The Project Director shall prepare a proposed operational staffing budget in accordance with state budgeting procedures which sets forth the number of positions and compensation for each. This budget must be approved by the Director of HCD. This budget may be revised as needs of the program change. The budget shall include funds for HCD operating costs and administrative costs. Caltrans shall provide HCD with advances on this as requested by HCD as may be provided in any service contract referred to in Paragraph III. A. above.

Once this internal operating budget is approved, the Project Director in hiring staff shall: (1) require a minimum level of experience in the housing field, (2) make every effort to hire people familiar with the local housing conditions, and (3) consult with the Steering Committee (hereinafter defined) in making staffing decisions. The final decision, however, regarding the recommendations to be made to the Director of HCD for the hiring of individual staff members shall be made by the Project Director.

The Project Director shall:

1. Establish an office in the I-105 Corridor area;

2. Acquire sites for replacement housing beginning concurrent with the commencement of planning;

3. Prepare a Housing Plan to be submitted to HAC in accordance with section III D;

4. Prepare a work program in development of the Housing Plan and submit it to the Steering Committee for review and comments;

5. Assist the HAC in the performance of its functions:

6. Solicit bids, select subcontractors and let contracts for work to be performed by outside consultants and contractors; monitor work performance of outside consultants or contractors.

The Project Director shall take an inventory of all available sites in the Corridor area suitable for move-on housing. There shall be three distinct zones: primary, secondary, and tertiary. The primary zone approximates an area within six miles on each side of the I–105 right-of-way; the secondary zone extends an additional six miles; and the tertiary zone yet another six miles. The Housing Plan as developed and presented by the Project Director will attempt to place as many replacement units as possible in the primary zone; if suitable sites are unavailable, the remainder should be placed in the secondary zone; if suitable sites still remain, the units may be proposed for siting in the tertiary zone. If there are still insufficient sites available in all three zones, the Project Director may provide for relocation beyond the identified zones but in each instance must attempt to locate the structures as close to the Corridor area as possible and reasonable.

C. *Housing Advisory Committee.*

A Housing Advisory Committee shall be established to consult with and provide assistance through the Project Director and staff. Total membership shall be limited to sixty (60) committee members. It shall have certain specified responsibilities as more fully set out below in reviewing the Housing Plan and Budget. The Housing Advisory Committee is not an agency of the federal government for any purpose.

The Director of HCD shall invite all appropriate regional and local planning bodies, housing agencies, and jurisdictions affected by the freeway to serve voluntarily on the HAC. Representatives of these official entities, however, shall at no time consist of more than 55% of the entire committee membership. No more than thirty-three (33) representatives of official entities shall be selected. There shall be at least one representative from Los Angeles County and each of the cities abutting upon the right-of-way of the I–105 Freeway. The balance of the representatives of official entities shall be chosen from jurisdictions located in the three housing replacement zones described herein at page 11, lines 6–10.

Plaintiffs and HCD shall jointly select the remaining twenty-seven (27) members of the HAC from organizations that have an interest in housing, citizen representatives, and persons who have been or will be displaced by the freeway.

HCD will pay the nonpublic official representatives a per diem of $60.00 per meeting. To be entitled to said per diem attendance for more than two-thirds of any meeting is required. Said per diem shall be to cover all expenses, including but not limited to travel and child care in the Los Angeles area. This per diem may be increased over the life of the project by HCD to match increases in the cost of living index. No more than one increase shall be made in any calendar year.

Except as supplemented by this Decree, the duties and responsibilities of the HAC shall be the same as those provided in 23 CFR section 740.118(d) and 25 California Administrative Code section 6124.

There shall be a Steering Committee of HAC which shall be comprised of the following seven members:

1. One representative of the City of Los Angeles selected by the Mayor of Los Angeles;

2. One representative of the County of Los Angeles selected by the Chairman of the Board of Supervisors of Los Angeles County;

3. One representative of the Southern California Association of Governments as selected by that body;

4. One representative of the corridor cities other than the City of Los Angeles

as selected by those members of the HAC who represent those corridor cities;

5. One representative of the displacees to be selected by the plaintiffs or the plaintiffs' successor in interest;

6. Two representatives of community groups, drawn from the membership of HAC and selected by the HAC members who do not represent public entities or jurisdictions.

The Steering Committee in consultation with the full Housing Advisory Committee shall:

1. Be consulted by the Project Director regarding staffing decisions and work program;

2. Review and recommend that the HAC approve or amend and approve (subject to further approval by the designated state officials as described below) the Housing Plan and its Budget;

3. Hold public hearings. In carrying out its review and approval responsibilities, the Steering Committee together with the HAC shall hold public hearings and review comments from any interested member of the public prior to making its decision.

The following quorum requirements shall be met by the HAC for any vote that calls for approval of the Housing Budget and/or Housing Plan: at the time the vote is taken, at least two-thirds of the membership shall be present and of those present, a number equal to 45% less two persons must be individuals who are not representatives of public entities or jurisdictions; if no quorum is present and if a vote on either the Housing Plan or Budget has been reasonably noticed and if six of the seven members of the Steering Committee are present, the Steering Committee shall be empowered to act for the entire HAC.

D. Time Limit for *HAC to Approve the Housing Plan and Program Budget.*

Prior to the presentation of the proposed Housing Plan and Program Budget, the Project Director shall meet regularly with the Steering Committee and HAC to present progress reports on the staff's development of the proposed Housing Plan and Budget and to receive any comments from members of the Steering Committee and HAC. The Steering Committee shall conduct public hearings and the full HAC shall approve the Plan and Budget either as presented by the Project Director or as amended by the HAC no later than 90 days after the Project Director submits it to the HAC. This period may be extended upon the written permission of the Secretary of Business, Transportation and Housing. If the HAC fails to approve the Housing Plan and Budget by majority vote as presented or amended within the time period, the Plan and Budget shall be deemed approved.

E. *Approval of the Housing Plan, Budget and Scheduling Decisions by State and Federal Officials.*

The Housing Plan and Program Budget approved by the HAC shall be reviewed and approved by the Director of HCD who shall have the authority to modify it as he or she deems appropriate. HCD must approve the Housing Plan and Program Budget submitted to it or approve it with HCD modifications no later than 60 days after the HAC submits the Housing Plan to HCD, all in accordance with state budgeting procedures.

HCD must submit the Plan and Program Budget to the HAC for review and comments if HCD has made any modifications to the Plan as HAC approved it; such modifications must be accompanied by detailed explanations.

HAC will then have 30 days to review the Housing Plan and Program Budget. If at the end of 30 days, HAC has irresolvable differences with HCD over provisions of the Housing Plan or Program Budget, it may refer such differences to the Secretary of Business, Transportation and Housing for resolution. The Secretary must resolve such conflicts within 30 days after they are submitted to him/her in writing. The Plan, as approved by the Secretary, shall be the adopted Housing Plan.

Should HCD or HAC fail to take action within the applicable time limit, it shall be deemed to have approved or concurred in the Housing Plan submitted to it. When the Housing Plan has been approved HCD shall thereupon submit the plan to Federal Highway Administration for concurrence.

## IV. *HOUSING PLAN*

This section sets out certain basic parameters to be followed by the Project Director and HCD in preparing the Housing Plan. These parameters are intended to be minimum standards only; the Plan may develop more comprehensive or creative methods of implementing the basic requirements enunciated herein.

This section of the Exhibit specifies the general categories of persons and households who may purchase or rent housing units developed under the Housing Plan. It also delineates the financial responsibilities of Federal and State defendants and suggests some methods by which these responsibilities could be implemented. It also sets some standards for the use of excess property acquired for use as freeway right-of-way but not used for that purpose.

The Federal and State defendants are responsible for the development, funding, and implementation of the Housing Plan described herein. However, once the Plan is fully carried out and the housing units developed are made available according to the terms of the Plan and this Decree, neither Federal nor State defendants (except, in the case of State defendants, to administer resale controls) shall have any further financial or administrative responsibilities as to those units.

A. Categories of Eligible Purchasers/Occupants.

1. Displacee purchase: To satisfy the last resort housing obligations of State and Federal defendants under the Uniform Relocation Act, 42 U.S.C.A. section 4601 et seq., any person eligible for benefits under the Uniform Relocation Act displaced by the freeway after the date of the Final Consent Decree (October 11, 1979), wishing to acquire a unit of housing developed under the Housing Plan pursuant to Uniform Relocation Act procedures may do so. No deed restrictions referred to in this Decree shall apply to a unit purchased at fair market value, and no legal or equitable title shall remain in Federal or State defendants after such a sale.

2. Low- and moderate-income housing: The I–105 freeway has had a severe deleterious effect on the supply of low-income housing within the freeway corridor and surrounding communities. To mitigate that effect, and to preserve the existing stock of low- and moderate-income housing, the Housing Plan shall make available all units not purchased by displacees at fair market value as low- and moderate-income housing. The Plan will utilize whatever methods are useful and appropriate to make this housing available at affordable prices. The term "affordable" as used throughout this section has the meaning given in Paragraph IV. C., below. The housing units shall be made available to members of various income groups as specified in Paragraph IV. C., below.

B. *Funding and Financing of the Housing Program.*

1. Defendants shall provide funds for, and/or financing of, all costs associated with the development and implementation of the housing program. These costs include, but are not limited to: planning, site acquisition and preparation, moving of units, rehabilitation, site landscaping, incidental expenses, and administrative costs. All such costs shall be considered project costs and shall be apportioned as such. All reasonable and proper expenditures necessary to complete this work to those standards specified in the memorandum of understanding pursuant to Paragraph IV. G., shall be approved as provided in the Service Agreement referred to in Paragraph III. A., herein. Caltrans shall seek reimbursement from Federal defendants for all project costs, and shall itself pay all ineligible costs including but not limited to housing project administration costs and overhead. HCD shall participate in all

meetings and discussions with FHWA or other state agencies regarding the Internal Operating Budget or Housing Program Budget. The final budgets shall be approved by FHWA. HCD shall consult with and obtain prior written Caltrans concurrence that proposed project expenditures are federally reimbursable. HCD shall obtain prior written Caltrans concurrence for any nonreimbursable expenditure as a condition to participation by Caltrans in project costs. HCD may deal directly with the Federal defendants in any activity necessary for the implementation of the housing program. Any dispute, between HCD and Caltrans, regarding the withholding of concurrence shall be resolved by the Secretary of Business, Transportation and Housing.

2. Title to all units shall pass to entities or persons other than the State and Federal defendants as hereinafter described. Legal ·or equitable title shall not remain with defendants after completion of the Housing Program.

3. The Housing Plan shall determine the method of ownership and/or rental sponsorship of all units developed. Ownership arrangements may include ownership by occupants, cooperative associations, ownership of homes by occupants with land leases held by public or nonpublic entities, lease with purchase options, and tenancy-in-common arrangements. Rental sponsors may include nonprofit organizations, partnerships between nonprofits and private developers/syndicators, public agencies, housing authorities, and investors.

4. The Housing Plan shall develop speculation and resale controls for units developed through this program to assure that all ownership units purchased at less than fair market value and all rental units shall remain affordable by persons at the designated low- and moderate-income levels. All these units shall have deed or lease restrictions placed upon them which limit resales in such a way that the inventory of low-cost housing is maintained for a

maximum of 59 years wherever feasible, and in no event, less than 20 years.

C. *Distribution of and Eligibility for Units.*

1. Distribution: All units shall be made affordable according to the following distribution schedule:

 a. At least 5% of all units shall be affordable to very very low-income households;

 b. At least 25% of all units shall be affordable to very low-income households;

 C. At least 25% of all units shall be affordable to low-income households;

 d. At least 25% of all units shall be affordable to moderate-income households;

 e. All other units shall be made affordable to households in the income categories above in such a way as to best meet the needs of the affected communities and displaced persons.

2. Definitions:

 a. Very very low-income: Households whose incomes do not exceed 25% of the median income for the L.A. Standard Metropolitan Statistical Area (SMSA) as adjusted for household size;

 b. Very low income: Households whose incomes are greater than 25%, but not more than 50% of the median income for the LA SMSA as adjusted for household size;

 c. Low income: Households whose incomes are greater than 50%, but not more than 80%, of the median income for the LA SMSA as adjusted for household size;

 d. Moderate income: Households whose incomes are greater than 80%, but not more than 120%, of the median income for the LA SMSA as adjusted for household size;

 e. Affordability: Replacement dwellings shall be considered affordable to households as follows: For single family units, a replacement unit is affordable when the household will pay no more than 35% of its adjusted income for prin-

cipal, taxes, interest, insurance, utilities and maintenance. For rental units, a replacement unit is affordable when the household will pay no more than 25% of its adjusted income for rent and utilities. Income is adjusted by deducting $300 per minor child from net income.

3. Priority for eligibility to purchase units: Except those units purchased by persons eligible for benefits under the Uniform Relocation Act pursuant to Paragraph IV. A. 1., above, units initially available for occupancy shall be offered to households for sale on the following priority basis:

a. First priority: Persons with incomes less than 120% of the median who are displaced after the date of the Final Consent Decree. For the purposes of this Amended Decree, the term "persons displaced after the date of the Final Consent Decree" shall include persons who have resided in property acquired for construction of the project for more than 180 days prior to the date (October 11, 1979) of the Final Consent Decree and who are displaced after the date of the Final Consent Decree. Such persons shall have first priority to purchase any unit which is designated for the income group for which they qualify at an affordable price subject to the deed restrictions as specified in Paragraph IV. B. 4.

b. Second priority: Households on housing authority waiting lists whose incomes fall within the target populations.

C. Third priority: Households whose incomes fall within the target populations.

4. Priority for eligibility to rent units: Units initially available for occupancy shall be offered to households for rent on the following priority basis:

a. First priority: Persons with incomes less than 120% of the median who are displaced after the date of the Final Consent Decree. For the purposes of this Amended Decree, the term "persons displaced after the date of the Final Consent Decree" shall include persons who have resided in property acquired for construction of the project for more than 180 days prior to the date (October 11, 1979) of the Final Consent Decree and who are displaced after the date of the Final Consent Decree. Such persons shall have first priority to rent any unit which is designated for the income group for which they qualify.

b. Second priority: All other persons with incomes less than 120% of the median who are displaced after the date of the Final Consent Decree (October 11, 1979) and who have commenced occupancy of the acquired dwelling prior to January 1, 1982.

c. Third priority: Households on housing authority waiting lists whose incomes fall within the target populations.

d. Fourth priority: Households whose incomes fall within the target populations.

D. *Financing.*

1. The financial responsibility of Federal and State defendants to make a unit available at an affordable price shall in no case extend beyond the costs of implementing the Housing Program as set forth in Paragraph IV. B. 1. Permanent financing for all units shall be obtained by occupants or sponsors of housing as defined in Paragraph IV. B. 3. Upon transfer of title of units developed, defendants shall receive a sum equal to no more than that purchase price which is necessary to make units affordable with conventional financing. Where necessary to achieve or approach affordable housing payments, title may be transferred at a cost of $1.00.

2. Federal "Section 8" housing funds or its successor program may be used to make units affordable at income levels specified above by subsidizing that portion of operating costs which cannot be paid for by tenant's affordable rents or co-op carrying charges, when units have been deeded to sponsors at a cost of $1.00. Section 8 funds may also be used to decrease the income level at which rents are affordable below the income levels called for by this

Exhibit, regardless of the sales price of the units.

3. Where units are purchased using the federal "Section 235" program, the California Housing Finance Agency's Home Ownership Home Improvement Loan Program, state or federal mortgage insurance programs, or similar programs which allow affordability to be achieved at prices higher than those which would be necessary to allow affordability under conventional financing, the difference between the conventional sales price and the actual sales price shall revert to a fund administered by the Housing Program. This fund shall assist in the creation and/or operating costs of below moderate-income housing.

4. Operating Costs: As used in this settlement, operating costs shall include, but not necessarily be limited to, taxes, utilities, insurance, management, maintenance, administration, and where units are sponsored by private for-profit entities, a reasonable profit.

F. *Excess Property.*

The Housing Plan shall include an inventory of excess property. It shall recommend future use for excess property. Excess property is defined as that property which was originally acquired for the I-105 freeway project but which is not incorporated within the final project.

1. Vacant Land:

Where excess land has been acquired and cleared, its potential use for relocation housing, schools, parks, open space, community facilities, or economic development projects shall be considered and given priority over other uses. The Federal defendants shall not require repayment of federal highway funds used for public projects. Where excess land is suitable for sites for move-on housing, displaced owners shall be given the opportunity to purchase such land and relocate his/her dwelling on the site.

2. Improved Land:

Where excess property has not been cleared and housing remains on the site,

such housing shall be considered for use as replacement housing.

Where property consists of land and dwellings which have been acquired but from which the original owner or pre-acquisition tenant has not moved, such owners or tenants shall be given priority to purchase their dwellings. Multiple-family units may be purchased as cooperatives, condominiums, or rental projects. Post-acquisition tenants of excess property for over 180 days prior to the date of the Final Consent Decree (October 11, 1979) shall be afforded right-of-first-refusal on purchase of excess property which they occupy. Relocation assistance payments may be used for purchase of such property. All units shall be made available at a price that is within the financial means of the person, as defined above.

3. Suitability for Relocation

The State defendants will determine which housing units remaining on the I-105 right-of-way will be used for relocation and rehabilitation. Dwelling units which will not be used will be disposed of on the following basis:

a. Made available without competitive bidding on a single simultaneous offering with awards to be made on the following priority basis:

(i) To any public or nonprofit agency for housing for low- and moderate-income households. Such agencies must give displacees highest priority for occupancy;

(ii) To any private offeror guaranteeing that such housing will be relocated within the affected areas;

b. If no purchaser in class (i) or (ii) above is available, the State may elect to demolish the unit or to dispose of it on the open market. In no event shall the State's election be made later than six months following the publication of the offer.

c. Any funds received through disposal of units from within the right-of-way will be credited to Federal funds for I-105.

### G. *Standards and Specifications.*

HCD and Caltrans shall, prior to completion of the Housing Plan, enter into a memorandum of understanding which shall set forth prototype specifications for rehabilitation. All units shall be rehabilitated or constructed to standards equal to or greater than those in the local jurisdictions and which may comply with HUD minimum property standards for rehabilitation. Specifications may exceed HUD minimum property standards for rehabilitation where it is determined that the long term benefits of such standards will outweigh any additional costs involved. The memorandum of understanding shall be amended to include prototype specifications for new construction whenever in the planning process a determination is made that new construction will be undertaken.

### H. *Relocation Assistance Payments.*

1. As part of the cost of facilitating implementation of the housing plan described herein, and in view of the hardships and uncertainty caused by delays in development of the I–105 project, current tenants of dwelling units in the I–105 right-of-way who moved into their dwelling units after they were acquired by Caltrans, and who have occupied such units for 180 days or more, shall be eligible to receive their reasonable moving expenses as determined by the existing approved moving cost schedule, including a dislocation allowance.

2. Displaced persons choosing to occupy one of the dwelling units provided by the Housing Plan described herein shall not be eligible to receive replacement housing payments, except where such payments are necessary to make such dwelling units affordable to the person, as specified in Paragraph IV. D. Where a displacee is not financially able to occupy one of such dwelling units, the relocation assistance payment shall be provided on the same basis as if the unit were available through the private market, and shall make up the difference between the rent of such dwelling unit and the person's ability to pay.

3. Occupancy of one of the dwelling units provided by the Plan described herein shall not diminish the eligibility of a displacee for moving payments.

### I. *Conformity with Local Law.*

Said replacement units shall be relocated or constructed so as to be in conformity with applicable zoning, subdivision and building code laws. This provision is not intended to change the practices followed under current law.

### EXHIBIT C

### STIPULATION AND ORDER TO AMEND EMPLOYMENT ACTION PLAN: AMENDED EMPLOYMENT ACTION PLAN

IT IS HEREBY STIPULATED AND AGREED by and between plaintiffs and defendants State Department of Transportation, Federal Department of Transportation and intervening Cities, by their respective counsel, to approve certain amendments to the Employment Action Plan, Exhibit C to the Consent Decree in the above-captioned matter, and to file an Amended Employment Action Plan which contains those modifications.

This stipulation is entered into and the Court's order approving same is respectfully requested pursuant to Section VI of the Consent Decree which sets forth procedures for amending the Decree. Since there are no objections by the parties to these amendments, the parties agree to file them by this Stipulation and Order.

The modifications to the Employment Plan are made pursuant to Section V of the unamended Employment Action Plan which provided that the parties would meet to negotiate appropriate changes to the Plan upon promulgation by the U.S. Department of Transportation of final federal regulations regarding participation of minority business enterprises in federal programs.

Filed concurrently with this Stipulation and Order are the Amended Employment Action Plan and Memorandum Explaining Modifications to the Employment Action Plan. Attached to the Memorandum is an

 interlineated version of the Plan showing both old and new language.

Dated: _____ RICHARD G. RYPINSKI
JOSEPH A. MONTOYA
RALPH LIVINGSTONE
By /s/ _____

Attorneys for State Defendants
Dated: _____ ANDREA S. ORDIN
MICHAEL E. WOLFSON
By /s/ Michael E. Wolfson _____

Attorneys for Federal Defendants
Dated: _____ JOHN R. PHILLIPS
JAN G. LEVINE
GEOFFREY COWAN
CARLYLE W. HALL, JR.
ALLETTA d'A. BELIN
TIMOTHY B. FLYNN
A. THOMAS HUNT
Center for Law in the Public Interest
By /s/ John R. Phillips _____

Attorneys for Plaintiffs

IT IS SO ORDERED.

*EXHIBIT C*

AMENDED EMPLOYMENT
ACTION PLAN

I. *INTRODUCTION*

This Exhibit sets forth an employment and business plan of affirmative action for the benefit of the corridor communities, women, and minority group members. This plan shall apply to all projects covered by this Decree including the Housing Plan outlined in Exhibit B. References following some provisions herein are from the Federal Register, Vol. 45 No. 63, pages 21184 et seq., March 31, 1980, Participation by Minority Business Enterprise in Department of Transportation Programs, to be codified at 49 C.F.R., Part 23.

The provisions of this plan have been agreed to by the parties and represent obligations distinct from those that are set forth in state and federal law. In the event that regulations referred to herein are changed, this Plan will remain in effect as presently drafted; however, any party may move to modify the Plan in accordance with procedures set forth in the Consent Decree.

APPENDIX A—Continued

As used in this Exhibit, "Minority" means a person who is a citizen or lawful resident of the United States and who is:

1. Black (a person having origins in any of the black racial groups of Africa);

2. Hispanic (a person of Spanish or Portuguese culture with origins in Mexico, South or Central America or the Caribbean Islands, regardless of race);

3. Asian American (a person having origins in any of the original peoples of the Far East, Southeast Asia, the Indian subcontinent, or the Pacific Islands); or

4. American Indian and Alaskan Native (a person having origins in any of the original peoples of North America).

5. Members of other groups, or other individuals, found to be economically and socially disadvantaged by the Small Business Administration under section 8(a) of the Small Business Act, as amended (15 U.S.C. 637(a)).

II. *BID SPECIFICATION DOCUMENT*

Above and beyond the "Equal Opportunity" and "Standard Federal Equal Employment Opportunity Contract Specifications" requirements set forth for all federally funded Caltrans projects, all Bid Specification Documents prepared in connection with the projects described in this Decree shall include the following elements among the enumerated responsiveness criteria:

A. *Minority Business Enterprise (MBE) Goals*

1. A "Minority business enterprise" or "MBE" means a small business concern, as defined pursuant to section 3 of the Small Business Act and implementing regulations, which is owned and controlled by one or more minorities or women. Owned and controlled means a business:

a. Which is at least 51% owned by one or more minorities or women; or, in the case of a publicly owned business, at least 51% of the stock of which is owned by one or more minorities or women; and

b. Whose management and daily business operations are controlled by one or more such individuals.

2. The goals for the dollar value of work to be awarded to MBEs for each project shall be determined in accordance with the procedures set forth in regulations at 45 Federal Register 21184 (to be codified at 49 C.F.R. Part 23,) section 23.45(g), with the following exceptions:

a. In light of the specific characteristics of the I–105 corridor, notably the high degree of unemployment among its residents and the large percentage of minority groups within the overall corridor population, concerning the factors to be considered in setting the MBE goals, strong emphasis shall be given to the population of the minority groups within the area. Relatively little weight shall be given to Caltrans' past results in their efforts to contract with MBEs since the MBE program is of relatively recent origin.

b. The Century Freeway Affirmative Action Committee (see *infra* ) shall have an opportunity to review the factors to be considered in setting the goals and shall participate in the setting of the goals. In the event that the Committee concludes that the overall goals set by Caltrans are inadequate, they may petition the Director of Caltrans. The Director shall hear the basis for the Committee's conclusions and review the adequacy of the goals. The Director may change said MBE goals, and the Director's decision shall be final.

3. Affirmative action techniques shall be developed and undertaken by the Caltrans Civil Rights Division with the assistance of the century Freeway Affirmative Action Committee to facilitate MBE participation in contracting activities. These techniques include:

a. Arranging solicitations, time for the presentation of bids, quantities, specification, delivery schedules so as to facilitate participation by MBEs;

b. Providing assistance to MBEs in overcoming barriers such as inability to obtain bonding, financing, and technical assistance;

c. Carrying out information and communication programs on contracting procedures and specific contracting opportunities in a timely manner, with such programs being bilingual where appropriate.

4. Caltrans Civil Rights Division and the Century Freeway Affirmative Action . Committee shall thoroughly investigate the full extent of services offered by banks owned and controlled by minorities or women in their community and determine the most feasible area in which to utilize the services of these banks. .

Prime contractors shall also be encouraged to utilize the services of banks owned and controlled by minorities or women.

5. Caltrans shall make available to bidders a directory or source list to facilitate identifying MBEs with capabilities relevant to general contracting requirements and to particular solicitations. It shall specify which firms the Department of Transportation, Caltrans, or the Small Business Administration has determined to be eligible MBEs in accordance with procedures set forth herein and at 45 Fed. Reg. 21185, subpart c.

6. Procedures to ascertain the eligibility of MBEs and joint ventures involving MBEs include the following:

a. To ensure that its MBE program benefits only firms owned and controlled by minorities or women, Caltrans shall certify the eligibility of MBEs and joint ventures involving MBEs that are named by the competitors. Caltrans may, at its own discretion, accept certifications made by other DOT recipients.

b. Caltrans, Division of Civil Rights, shall seek the advice of, and consult with the Century Freeway Affirmative Action Committee in the MBE certification process.

7. Procedures to require that participating MBEs are identified by name by competitors for contracts are as follows: Caltrans shall indicate, in solicitations for DOT-assisted contracts that provide opportunities for MBE participation, goals for the use of firms owned and controlled by minorities and firms owned and controlled

by women. Solicitations shall require all bidders/proposers to submit a written assurance of meeting the goals in their bids or proposals. Within a reasonable time after the opening of bids and before the award of the contract, Caltrans shall require all bidders or proposers wishing to remain in competition for the contract to submit the names of MBE subcontractors and suppliers, a description of the work each is to perform, and the dollar value of each proposed MBE subcontract. Caltrans shall set the time at which bidders and proposers are required to submit this information and inform bidders and proposers of this time in the solicitation. Agreements between a bidder/proposer and an MBE in which the MBE promises not to provide subcontracting quotations to other bidders/proposers are prohibited.

8. MBE participation shall be counted toward meeting MBE goals set in accordance with federal regulations 45 Fed.Reg. 21187, § 23.47, and this Plan as follows:

a. Once a firm is determined to be an eligible MBE in accordance with this subpart, the total dollar value of the contract awarded to the MBE is counted toward the applicable MBE goals.

b. The total dollar value of a contract to an MBE owned and controlled by both minority males and non-minority females is counted toward the goals for minorities and women respectively, in proportion to the percentage of ownership and control of each group in the business. The total dollar value of a contract with an MBE owned and controlled by minority women is counted toward either the minority goal or the goal for women, but not to both. The contractor employing the firm or Caltrans may choose the goal to which the contract value is applied.

c. Caltrans or a contractor may count toward its MBE goals a portion of the total dollar value of a contract with a joint venture eligible under the standards of this subpart equal to the percentage of the ownership and controls of the MBE partner in the joint venture.

d. (1) Caltrans or a contractor may count toward its MBE goals only expenditures to MBEs that perform a commercially useful function in the work of a contract. An MBE is considered to perform a commercially useful function when it is responsible for execution of a distinct element of the work of a contract and carrying out its responsibilities by actually performing, managing, and supervising the work involved. To determine whether an MBE is performing a commercially useful function, Caltrans or the contractor shall evaluate the amount of work subcontracted, industry practices, and other relevant factors.

(2) Consistent with normal industry practices, an MBE may enter into subcontracts. If an MBE contractor subcontracts a significantly greater portion of the work of the contract than would be expected on the basis of normal industry practices, the MBE shall be presumed not to be performing a commercially useful function. The MBE may present evidence to rebut this presumption to Caltrans. Caltrans' decision on the rebuttal of this presumption is subject to review by the Department of Transportation.

e. Caltrans or a contractor may count toward its MBE goals expenditures for materials and supplies obtained from MBE suppliers and manufacturers, provided that the MBEs assure the actual and contracted responsibility for the provision of the materials and supplies.

(1) Caltrans or a contractor may count its entire expenditure to an MBE manufacturer (i.e., a supplier that produces goods from raw materials or substantially alters them before resale).

(2) Caltrans or a contractor may count 20% of its expenditures to MBE suppliers that are not manufacturers, provided that the MBE supplier performs a commercially useful function in the supply process.

9. On each contract awarded under this subsection, prime bidders shall make a good faith effort to use at least five MBEs. Each contract shall be of a minimum dollar

amount to be determined by the Caltrans Civil Rights Division and the Century Freeway Affirmative Action Committee (CFAAC). This provision may be waived on individual contracts upon the mutual agreement of the Caltrans Civil Rights Division and CFAAC.

10. Selection criteria to ensure that prime contracts are awarded to competitors that meet MBE goals include the following:

a. If any competitor offering a reasonable price meets the MBE contract goal, Caltrans shall presume conclusively that all competitors that failed to meet the goal have failed to exert sufficient reasonable efforts and consequently are ineligible to be awarded the contract.

b. To implement this presumption, Caltrans shall determine whether the competitor offering the lowest price of firms meeting the MBE contract goal has offered a reasonable price for the contract. If Caltrans determines that this competitor has offered a reasonable price Caltrans shall award the contract to the firm. If Caltrans determines that this competitor's price is not reasonable, it shall consider next the price offered by the competitor with the highest percentage of MBE participation of those firms that failed to meet the goal. If Caltrans determines that this price is reasonable it shall award the contract to this competitor. If Caltrans determines that this price is not reasonable, Caltrans shall consider the other competitors that failed to meet the goal in order of their percentage of MBE participation until it selects one with a reasonable price. If Caltrans determines that no competitor with MBE participation has offered a reasonable price Caltrans may award the contract to any competitor that demonstrates that it has made sufficient reasonable efforts to meet the MBE contract goal.

c. To decide whether a price offered by a competitor is reasonable, Caltrans shall use the same criteria that it would use to determine whether, if the competitor had made the only offer to perform the contract, Caltrans would award the contract.

d. To demonstrate sufficient reasonable efforts to meet the MBE contract goal, a contractor shall document the steps it has taken to obtain MBE participation, including but not limited to the following:

(i) Attendance at a pre-bid meeting, if any, scheduled by Caltrans to inform MBEs of subcontracting opportunities under a given solicitation;

(ii) Advertisement in general circulation media, trade association publications, and minority-focus media, for at least 20 days before bids or proposals are due. If 20 days are not available, publication for a shorter reasonable time is acceptable;

(iii) Written notification to MBEs that their interest in the contract is solicited;

(iv) Efforts made to select portions of the work proposed to be performed by MBEs in order to increase the likelihood of achieving the stated goal;

(v) Efforts made to negotiate with MBEs for specific subbids including at a minimum:

(a) The names, addresses, and telephone numbers of MBEs that were contacted;

(b) A description of the information provided to MBEs regarding the plans and specifications for portions of the work to be performed; and

(c) A statement of why additional agreements with MBEs were not reached;

(vi) Efforts made to assist the MBEs contacted that needed assistance in obtaining bonding or insurance required by the competitor or Caltrans;

(vii) Concerning each MBE the competitor contacted but rejected as unqualified, the reasons for the bidder's conclusions.

e. Competitors that fail to meet MBE goals and fail to demonstrate suffi-

cient reasonable efforts shall not be eligible to be awarded the contract.

f. To ensure that all obligations under contracts awarded to MBEs are met, Caltrans shall review the contractor's MBE involvement efforts during the performance of the contract. The contractor shall bring to the attention of Caltrans any situation in which regularly scheduled progress payments are not made to MBE subcontractors.

11. Caltrans shall require their prime contractors to make good faith efforts to replace an MBE subcontractor that is unable to perform successfully with another MBE. Caltrans Division of Civil Rights shall approve all substitutions of subcontractors during contract performance, in order to ensure that the substitute firms are eligible MBEs. The Century Freeway Affirmative Action Committee is to be advised of all such substitution requests and if the Committee disagrees with the actions of the Caltrans Division of Civil Rights, the Committee may appeal to the Director of Transportation whose decision shall be final.

12. Each bidder who intends to subcontract a portion of the work shall require each subbidder for a portion of the work to submit its subbid or proposal in writing in sealed form to the Century Freeway Affirmative Action Committee. At the pre-award conference, see paragraph III. B. herein, the Affirmative Action Committee shall open all subbids and proposals for subcontracted work and may consider them in determining if the bidder has met the responsiveness criteria.

13. Where allowable under local law and determined by Caltrans and the Century Freeway Affirmative Action Committee to be necessary to meet MBE goals, procedures to implement MBE set-asides shall be established. MBE set-asides shall be used only in cases where at least three MBEs with capabilities consistent with contract requirements exist, so as to permit competition. (45 Fed.Reg. 21188, § 23.45(k).)

14. The bidder shall designate, and make known to the Century Freeway Affirmative Action Committee (see section IV. C. *infra*) a liaison officer to administer the bidder's minority business enterprise and equal employment opportunities programs.

15. In order to monitor the progress of its MBE program, Caltrans, with the assistance of the Century Freeway Affirmative Action Committee, shall develop a record keeping system which will identify and assess MBE contract awards, prime contractors' progress in achieving MBE subcontract goals, and other MBE affirmative action efforts.

Specifically, Caltrans shall maintain records showing:

a. Procedures which have been adopted to comply with the requirements of this plan;

b. Awards to MBEs. These awards shall be measured against projected MBE awards and/or MBE goals. To assist in this effort, Caltrans shall obtain regular reports from prime contractors on their progress in meeting contractual MBE obligations;

c. Specific efforts to identify and award contracts to MBEs;

d. Reports:

(i) Caltrans shall submit to the Century Freeway Affirmative Action Committee copies of reports conforming in frequency and format to existing contract reporting requirements of the federal Department of Transportation. Where no such contract reporting requirements exist, MBE reports shall be submitted quarterly.

(ii) These reports shall include at a minimum:

(a) The number of contracts awarded to MBEs;

(b) A description of the general categories of contracts awarded to MBEs;

(c) The dollar value of contracts awarded to MBEs;

(d) The percentage of the dollar value of all contracts awarded during this

period which were awarded to MBEs; and

(e) An indication of whether and the extent to which the percentage met or exceeded the goal specified in the application.

(§ 23.47(a) through (d), p. 28940–1.)

### B. *Equal Employment Opportunity Goals*

1. The goals for minority and female participation, expressed in percentage terms for the contractor's aggregate work force in each trade on all construction work on projects covered by this Decree, during specified time periods, shall be as follows:

a. Minority Participation:

| Time Period | Trade | Goal |
|---|---|---|
| 1979–1980 | All | The figure established by the Depart- |
| 1980–1981 | All | ment of Labor ("DOL") for federally |
| 1981– | All | financed construction in L.A. County until such time as specified goals have been determined pursuant to a study to be conducted by Caltrans. |

The criteria to be used in the study shall be as follows:

(i) Percent of unemployed in corridor who are minorities;

(ii) Percent of minorities in total corridor population;

(iii) Percent of minorities now employed in large Caltrans projects;

(iv) In addition to other criteria there shall be considered past employment obstacles to socially and economically disadvantaged individuals. If effective and feasible strategies can be developed which will lessen or remove these obstacles, then in fixing goals, *future improved performance should be considered.*

b. Female Participation:

| Time Period | Trade | Goal |
|---|---|---|
| 1979–1980 | All | The figures established by the DOL |
| 1980–1981 | All | for federally financed construction |
| 1981– | All | in L.A. County until such time as specific goals have been determined pursuant to a study to be conducted by Caltrans. |

The criteria to be examined in the study shall be as follows:

(i) Percent of unemployed in corridor who are women;

(ii) Percent of women in total corridor population;

(iii) Lost current participation rates available for women in construction industry in California, including percent of females in total construction labor force and percent of total female labor force in construction related jobs;

(iv) Number of women currently entering into apprenticeship programs for categories of crafts people, kindred workers and operatives in construction industry (percent of total);

(v) In addition to other criteria there shall be considered past employment obstacles to socially and economically disadvantaged individuals. If effective and feasible strategies can be developed which will lessen or remove these obstacles, then in fixing goals, future improved performance should be considered.

Goals may be set higher than the DOL goals to reflect demand and supply of female labor as revealed by criteria above. In addition, higher goals may be set in response to documented increase in interest in construction jobs on the part of women who are aware that federal law requires that contractors make best efforts to hire percentage goals of female workers. (See Bem & Bem, "Are Women Interested in Construction Jobs?: The Role of Affirmative Action," Department of Psychology, Stanford University.) In no event may goals be less than DOL goals.

Once new goals are determined, they will be only applicable to the contractor's construction work on the projects covered by this Decree.

2. The goals for minority and female participation expressed in percentage terms for the contractor's management jobs at the corporate level whether or not related to the projects covered by this Decree, shall be as follows:

Minority Management-level Jobs: 5–10%
Female Management-level Jobs: 5–10%

3. At least one-fourth of the women and minority group members employed in

apprenticeship and training programs shall be people hired for the first time for work on a major state or federally-funded construction job.

4. The bidder shall exercise "best efforts" to meet the goals set forth in this subsection by locating and employing minority group members and females who regularly reside in the corridor communities. All efforts to comply with this provision shall be fully documented.

5. The bidder's responsiveness and the contractor's compliance with these requirements shall be based on its plans for and its actual implementation of the Equal Opportunity Clause, specific affirmative action obligations required by the specifications set forth in 41 C.F.R. 60–4.3(a), and its efforts to meet the goals established herein. In addition to the requirements set forth in the "Standard Federal Equal Employment Opportunity Construction Contract Specifications" (Executive Order 11246), "best efforts" to meet these goals shall include, but not be limited to, concrete and meaningful efforts to achieve, publicize or advertise job availability and the contractor's EEO policy through the news media, specifically including minority and female news media, and to make serious and meaningful use of the services and contracts of the Century Freeway Affirmative Action Committee.

6. A bidder's failure to establish a comprehensive affirmative action plan designed to meet these goals effectively will be grounds for finding the bid or proposal nonresponsive.

C. *Regional Business and Employment Goals*

1. In addition to its commitment to utilize minority subcontractors and to hire minority and female employees, each bidder shall, in making bids and carrying out work pursuant to this Decree, make best efforts to find and utilize qualified contractors and persons who regularly reside or have their principal place of business in the area where the project is situated, except:

a. To the extent that qualified persons regularly residing in the area are not available;

b. For the reasonable needs of the contractor or his subcontractors to employ supervisory or specially experienced individuals necessary to assure execution of the contract;

c. For the obligation of the contractor or his subcontractors to offer employment to present or former employees as the result of a lawful collective bargaining contract, provided that in no event shall the number of nonresident persons employed under this subparagraph "c" exceed 20% of the total number of employees employed by such contractor and his subcontractors on such project;

d. To the extent that this provision may conflict with the minority business and employment goals, those goals take precedence.

D. *Other Provisions*

The Bid Specification Document also will include all of the other provisions of this Decree which pertain to minority business and employment.

III. *CONFERENCES*

A. *Pre–Bid Conference*

1. Caltrans and the Century Freeway Affirmative Action Committee shall convene a pre-bid conference to be attended by all contractors who intend to bid on the contract. Attendance at the meeting will be a specific consideration in determining whether bidders meet the responsiveness criteria.

2. Caltrans and the Century Freeway Affirmative Action Committee will aggressively seek to publicize and advertise each such pre-bid conference. The publicity campaign will be specifically designed to reach corridor community and minority business enterprises through sources including trade associations, trade publications, and newspapers and broadcasting stations which effectively penetrate the

corridor communities and minority communities.

3. The conference will be designed to educate contractors about the general requirements of state and federal affirmative action plans, as well as about the specific requirements established pursuant to this Decree.

4. The conference will also be designed to introduce bidders to interested minority business enterprises.

B. *Pre–Award Conference*

1. Before each bid is accepted, Caltrans and the Century Freeway Affirmative Action Committee shall convene a pre-award conference with the apparent lowest responsive and responsible bidder, the subcontractors it proposes to use, and any relevant unions.

2. The conference shall be designed to help Caltrans and the Century Freeway Affirmative Action Committee determine whether the plans of the bidder are truly responsive to the goals and requirements set forth in the Bid Specification Document.

3. Attendance at the meeting will be a specific consideration in determining whether bidders meet the responsiveness criteria.

C. *Separate Pre–Construction Conference on Equal Employment, Minority Business Enterprises, and Business Preferences*

1. Above and beyond any pre-construction conferences which Caltrans may hold on other project-related issues, Caltrans and the Century Freeway Affirmative Action Committee shall, in connection with each project, hold a special pre-construction conference on equal employment, minority business enterprise, and regional employment and business preference aspects of the project.

2. The conference shall be designed to ensure that the contractor is fully implementing the pledges made in its bid.

3. Attendance at the conference will be a specific consideration in determining whether bidders and contractors meet the responsiveness criteria.

IV. *CENTURY FREEWAY AFFIRMATIVE ACTION COMMITTEE*

A. *Membership*

The Committee shall have seven (7) members. The following shall each appoint an individual who has three or more years' experience working on the implementation of plans for equal employment and/or minority business enterprises:

1. Caltrans Civil Rights Division;

2. Federal Highway Administration ("FHWA") Civil Rights Division;

3. Board of Supervisors of the County of Los Angeles;

4. The Los Angeles branch of the National Association for the Advancement of Colored People ("NAACP");

5. National Organization of Women ("NOW");

6. Mexican–American Opportunity Foundation;

7. The Governor of California.

B. *Duties and Responsibilities*

The Committee shall:

1. Establish a regular schedule of sessions for conducting business.

2. Hire an Executive Director and staff, as described in Paragraph IV. C. 1 and 2, and work with it to achieve the tasks set forth in this Exhibit to the Decree; establishing operating headquarters within the corridor communities.

3. Prepare a reasonable budget for submission to Caltrans and FHWA for approval.

4. Review and prepare written comments on the responsiveness of all bids and contracts. The final decision as to whether a bid is fully responsive rests with Caltrans; however, where the Committee, on written findings, concludes that a bidder does not meet the affirmative action responsiveness criteria, Caltrans will fully consider the Committee's objec-

tions. Any decision to reject the Committee's findings, therefore, will only be made by the Director of Caltrans, after holding a public hearing, and any such decision will be accompanied by a reasoned written explanation of the Director's conclusions. A hearing officer may be appointed by the Director to conduct the hearing.

5. Conduct periodic reviews of each contractor's performance, receive complaints, and conduct regular on-site inspections and interviews. The final decision to impose legal sanctions including, but not limited to, cancellation, termination, or suspension of the contract in whole or in part, or declaration that the contractor is ineligible for further government contracts, rests with Caltrans; however, where the Committee concludes that such action is warranted, and submits a written petition to the Director of Caltrans, the Director will hold a public hearing or "compliance conference" at a site in one of the corridor communities. Notice of the meeting will be provided to the Committee and to other interested parties well in advance, and the Committee will be given a reasonable opportunity to participate and to present its views. The Director will render a decision in the petition expeditiously, and the decision will be accompanied by a reasoned written explanation of the Director's conclusions.

6. Aggressively assist in the process of achieving equal employment minority business participation, and regional employment and business, by helping to locate and recruit employees, contractors and subcontractors; and by establishing effective programs for contractors and subcontractors who are unable to meet MBE and Equal Employment Opportunity goals.

7. In carrying out its tasks, the Committee will have full access to all relevant data obtained by or in the files of Caltrans and FHWA, except where access to such data is specifically prohibited by existing law. Caltrans will circulate all relevant documents and materials to the Committee in a timely fashion, including all draft Bid Specification Documents, affirmative action plans and notices, and project bids as soon as they are opened.

8. Request amendments to this section of the Decree from the parties to it should the Committee feel such action is necessary.

## C. Staff

1. *Executive Director:* An Executive Director shall be appointed by the Civil Rights Division of Caltrans after full consultation with the Committee. The Committee shall participate in the annual evaluation of the Director which is conducted under applicable civil service requirements.

2. *Additional Staff:* The Committee and the Executive Director shall hire such additional staff and retain such consultants as are required to fully implement the Committee's responsibilities.

## D. Funding

1. The budget prepared by the Committee shall be considered a project cost and shall be paid for by Caltrans and FHWA and apportioned in the same ratio out of federal and state trust fund resources as any other qualifying project cost.

2. Nongovernmental members of the Committee shall be compensated at the rate of $60.00 per meeting. To be entitled to said compensation, attendance for more than 75% of any meeting is required. This compensation may be increased by Caltrans to match increases in the cost of living index.

## E. Public Hearing and Records

Except where matters concerning Committee personnel, legal proceedings or trade secrets require confidentiality, all Committee meetings and records shall be open to the public.

EXHIBIT D